JOHN B. KREITZ

v.

CHARLES F. A. BEHRENSMEYER.

*Filed at Springfield May 9, 1888.*

1. ELECTIONS—*contested election—not a suit at law.* A proceeding to contest an election is not a suit at law.

2. SAME—*jurisdiction in contest—as to county treasurer.* The county court has jurisdiction of a contested election in respect to the office of county treasurer, etc., and such contest is cognizable alone at a probate term.

3. SAME—*of the petition—its requisites.* In a proceeding to contest the election of a county officer, in the county court, on the ground that the judges of the election miscounted the ballots or failed to count them correctly, it is not necessary that the petition shall state the names of the persons whose ballots are claimed to have been improperly counted.

4. SAME—*waiver of objection to petition.* It is a clear violation of the right of a secret ballot, to allow a contestant of an election, on mere suspicion, to have the ballots exposed and subjected to scrutiny, to enable him to find objections upon which to make a tangible charge. But when the defendant, instead of demurring, answers the petition generally, and makes issues of fact, and gives evidence upon the general and indefinite, as well as the specific, allegations of the petition, he will thereby waive the objection to the general and indefinite charges.

5. SAME—*of the answer—its requisites—as affecting the admissibility of evidence.* In a proceeding to contest an election, less particularity is required in the answer of the defendant than in the petition. When the petitioner alleges that he was elected, and this is denied, it is competent for the defendant to show that persons voting for the contestant, whose names are not given in the answer, were not legal voters.

6. The burden of proof is on the contestant to show that a majority of the legal votes cast at the election were for him, and the production of the ballots cast for him raises the presumption, *prima facie*, that they were legal votes. But the defendant may rebut the presumption by showing that the ballots are not what they purport to be,—in other words, that they are not the ballots of legal voters; and this he may do without having stated in his answer the names of the persons so illegally voting.

7. An allegation in the answer that in addition to the illegal votes named therein, ten illegal votes were counted for the contestant for the office, is subject to exception for indefiniteness. But if no exception is taken, objection to evidence showing such illegal votes were counted, will not avail.

8. SAME—*qualifications of voter—children of alien woman who is married to a citizen.* Whenever a woman, alien born, who might be naturalized, is in a state of marriage to a citizen, whether his citizenship existed at the passage of the act of Congress of February 10, 1855, or before or after the marriage, she becomes by that fact a citizen also; and this citizenship is not lost by the subsequent death of her husband and her afterward marrying an alien, and the children of such a woman, under the age of twenty-one years, become citizens by virtue of her citizenship. But this acquiring of citizenship will not extend to members of the family who are not children.

9. SAME—*age of voter—how shown.* On the contest of an election, a person who voted for the contestee testified that before the election his father had told him that he was twenty-one years of age, and that it had always been reputed in the family that he was born February 6, 1865, and that he supposed he was of age when he voted in November, 1886. He was then asked, on re-direct examination, "What does your family record say?" which was objected to. The court overruled the objection, and he answered, "The family record says I was born February 6, 1866:" *Held,* that the admission of this evidence was clearly erroneous. The family record should have been produced, or if that could not be done, a proved copy should have been produced; and it should have been shown when and by whom the record was made, and parol evidence of the witness' conclusion of what it proves should not have been received.

10. SAME—*residence of voter—what constitutes.* A man may acquire a domicile or residence, if he be personally present in a place and elect that as his home, even though he does not design to remain there always, but designs at the end of some time to remove and acquire another.

11. It does not follow, however, because a man must have a domicile somewhere, and that a domicile once gained remains until a new one is acquired, that he must be entitled to vote somewhere, or that the right to vote at a particular poll being once established, is presumed to continue until the right to vote elsewhere is shown. Permanent residence is but one of the requisites of the right to vote, and it must in this State always precede the election by an extended space of time, in one respect for a year, in others for ninety and thirty days.

12. SAME—*change or abandonment of residence.* Abandonment of a residence is instantaneous, and if it be by a voter of a residence in one voting district, at a date too near the election for the requisite intervening time of residence to be a voter in another voting district to which he has removed, the voter will be entitled to vote in neither district.

13. Where one leaves his residence or acquires a new one, it is the intention with which he does so that is to control. Hence the shortest absence, if at the time intended as a permanent abandonment, is sufficient, although the party may soon afterward change his intention. On the other hand, an absence for months, or even years, if all the while intended as a

mere temporary absence for some temporary purpose, to be followed by a resumption of the former residence, will not be an abandonment.

14. On the question of intention as to residence, the declaration of the party, though admissible, is not necessarily conclusive, because it may be disproved by his acts.

15. If a person should remove his family to a particular district, there build and furnish them a home, keep his property there, return there constantly as leisure allows, and remain there with his family during sickness and unemployed times, this would constitute his residence, notwithstanding he might be employed in labor in another district, and claim that to be his residence.

16. If a person having no family, leave, or, having a family, take them with him, and leave this State to go to another State, and there make a home, and seek to acquire rights by virtue of its being a permanent residence, such as acquiring a homestead under the acts of Congress, or exercising the rights of an elector, to which permanent residence is requisite, his subsequently testifying that he had never intended to permanently abandon his residence here, but had all the time intended at some future day to return, could not control.

17. Since the question of the intention, as well as of the act of a party in leaving a particular abode and adopting and retaining another, is the subject of proof, it follows that evidence applicable to either is admissible. Although less weight is given to the party's declarations than to his acts, still his declarations of his mental state, so long as that shall be the subject of inquiry, must be admissible.

18. So it is held, that conversations and declarations in regard to present or future domicile, although not accompanying acts, still are admissible in evidence, and must be weighed with the other evidence. Although the lowest species of evidence, they are competent.

19. SAME—*declarations of voter—after election—to show want of qualification to vote.* The declarations of a voter, made after the election, can not be received in evidence on a contested election to show he was not qualified to vote.

20. SAME—*time to assert right to vote—after refusal by election judges.* If a legal voter offers his ballot, which one of the judges takes, saying he will see about it, but subsequently refuses to deposit it in the ballot-box, and the voter fails to insist on his right to vote by furnishing the evidence required by the statute to entitle his vote to be received, there will be no error in refusing to count his vote on a contest of the election.

21. SAME—*recounting the ballots—as excluding further inquiry.* It does not follow, from the fact that on a contest the ballots are ordered to be recounted, that all inquiry whether they have been tampered with is precluded.

22. Nor does the mere fact that ballots are recounted, preclude all inquiry as to whether they are really the ballots cast, or that they have the same names on them as when cast by the voters.

23. Where the contestant makes a *prima facie* case that there is a necessity for a recount of the ballots, and that they have not been tampered with, an order for a recount will be made. After the recount has been made, the incumbent of the office may show that the ballots have been changed, or should be discredited for any other cause. In such case, the inspection of the ballots might furnish ample evidence that they have been tampered with or changed since they were cast.

24. SAME—*change of ballots after being voted—evidence in respect thereto.* On the contest of an election, in which the contestant claims that he has received a majority of the legal votes cast, and when a recount is had of the ballots, it is competent for the contestee to show on the trial that ballots cast for him have been changed by a paster so as to read as a vote for the contestant, and also that ballots, after being cast, have been destroyed and different ballots put in their place, even though no fraud is alleged in the answer against the officers conducting the election. And for this purpose the contestee may prove, by the voter, that the ballot bearing his number is not the one cast by him.

25. Before the recount of the ballots returned from a certain poll, the contestant stated that if any question was made as to the identity of the ballots cast at such poll with those about to be counted, he wanted a judge or clerk of such district present, and the contestee making no question as to such identity, the recount proceeded without the presence of such judge or clerk. This admission was relied on by the contestant as preventing the contestee from showing that any of the ballots recounted were not genuine: *Held,* that the admission, being for the mere purpose of dispensing with the preliminary proof to authorize the recount, did not preclude the contestee from showing that certain of the ballots recounted were forgeries, and were not in fact those cast by the voters.

26. SAME—*missing ballots—evidence.* On a contest of an election, the contestee offered to prove by a legal voter that he voted a ballot of a certain number in favor of contestee, and, by other evidence, that at the time of the recount no such ballot was found and counted, which the court refused to allow, on the ground the answer failed to charge the abstraction of any ballots, or of any misconduct on the part of the judges of election: *Held,* that the court erred in excluding the proposed evidence, and that it was competent, as rebutting the contestant's evidence tending to show his election. As the contestee could not have known the ballot was missing before the recount, he was not required to state that fact in his answer.

27. SAME—*no ballot corresponding with number on poll-book.* Where the poll-book of an election precinct showed that twenty-five persons voted at an election, the contestee offered to prove that such persons were legal

voters of that precinct, and that they all voted for him, and that no ballots were returned bearing the numbers set opposite their names, which the court refused to admit: *Held*, that the court erred in refusing the evidence, and that contestee was entitled to have their votes counted for him.

28. It will be presumed that election officers discharge their duty by numbering each ballot cast, with the number set opposite the voter's name, and when no ballot is found corresponding with the number of the voter, it will be presumed that such ballot has been lost or abstracted, in the absence of any proof showing a mistake or ballots without any number, and such vote should be counted on a recount.

29. SAME—*unnumbered ballot—how disposed of.* The statute requires that before an unnumbered ballot shall be destroyed by the judges of the election, it shall be ascertained that the number of the ballots in the box exceeds the number of names entered on each of the poll-lists. On a contest of the election it will be presumed that the judges of the election discharged their duties, and when an unnumbered ballot is not destroyed by them, it is reasonable to suppose the two poll-lists did not agree.

30. On the recount of the ballots of a certain election precinct upon the contest of an election, the court found two unnumbered ballots, and by examining the poll-list returned with the ballot-box, it was determined that there was one more ballot than there were names on the poll-list, whereupon the court destroyed one of those ballots, without finding whether the poll-lists agreed: *Held*, that the action of the court was erroneous.

31. If it be conceded that an unnumbered ballot was actually cast by a legal voter, it should not be destroyed, but the statute contemplates that the ballots shall be correctly numbered, and hence that every ballot, as cast, will have the number of the voter indorsed upon it, and this being done, and the whole number of ballots being in excess of the number of the voters as shown by the lists, it must follow that the unnumbered ballot is improperly in the box, and it should be destroyed.

32. SAME—*two ballots folded together.* Where two ballots are cast folded together, the outside one alone numbered, it is proper to reject both. The statute requires the names of the candidates voted for shall be written or printed on the same piece of paper, and the inclosing of one ballot within another, with the names of the candidates upon each, is plainly an attempt to vote twice, and is therefore such a fraud upon the rights of other electors as to require that the voter's ballot shall not be counted.

33. SAME—*ballot giving the names of several for the same office.* Where a voter has a ticket given him which has the names of two persons for one and the same office, the one printed and the other written therein, and he votes the same, the statute is imperative that it shall not be counted for either candidate.

34. SAME—*ballot with a name erased.* Where it appears that there has been an erasure of a name of a candidate, it may be shown that it was not

done by the voter, or that it was the result of an accident, and not of intention; but the fact of an erasure being conceded to have been the deliberate act of the voter, it can not be explained that by it he intended a different result than what the law implies from it.

35.  SAME—*name not properly given in ballot—evidence, etc.*  On the contest of an election, it is not competent to prove by the voter that he intended a ballot plainly for a particular name, for one having no such similarity of sound as that one might reasonably be intended for the other; but it is competent to prove by him what he understood the names of the candidates to be, and how he reads his ballot.

36.  If the elector has used the letters of a foreign language to express the name of the candidate, it is competent to prove by him, or by some one else versed in that language, what word or words they make.  If the characters are so complex in their formation, or so imperfectly formed, or so obscurely impressed, as to make it difficult to read them, it is competent to prove, by any one understanding them, what they are.

37.  Where it is shown that there were but three candidates for the office of county treasurer, John B. Kreitz, the democratic nominee, Charles F. A. Behrensmeyer, the republican nominee, and B. L. Dickerman, the prohibition nominee, and that Kreitz had a brother named John M. Kreitz, who was not a candidate, and that John B. Kreitz was ordinarily known and called John Kreitz, while John M. Kreitz was ordinarily known and called Matt Kreitz, it was *held,* that some tickets bearing the name of John M. Kreitz for county treasurer were properly counted for John B. Kreitz.

38.  In the same case it was shown that there were several other persons in the county by the name of Behrensmeyer, but that no other person of that name was a candidate for that office.  The court counted many ballots for Charles F. A. Behrensmeyer which had merely "Behrensmeyer" on them for treasurer, without any designation of the christian name: *Held,* that such ballots were properly counted for Charles F. A. Behrensmeyer.

39.  On a contested election by Behrensmeyer against Kreitz, there was evidence that some persons pronounced the contestant's name "Benmire," and that others pronounced it by a still shorter name: *Held,* that any evidence proving that the voter had intended and attempted to express contestant's name as he understood it, was properly admissible.

40.  At an election, John B. Kreitz and Charles F. A. Behrensmeyer were candidates for the office of county treasurer.  In certain ballots the name written after treasurer was "John B. Knirs," and in certain others the name was "Dehbsumeyer:"  *Held,* that the ballots could not be aided by extraneous proof, for the reason there was no similarity in sound between the latter names and the names of the candidates.

41.  SAME—*voter testifying for whom he did vote.*  It is true that a voter can not be allowed to testify that he voted for one person when he admits he cast a ballot, which has not since been changed, showing that he voted

for another; but this rule does not apply where the ballot purporting to be his is not genuine, but is a forgery. A ticket which has been changed by a paster to read as a vote for a man for a particular office different from the ·man for whom it read as a vote in the condition in which it was when cast, is a forgery; and the same is true when the ballot, after it is cast, is destroyed, and another and different ballot is put in its place. In such case the voter may testify for whom he, in fact, did vote.

42. SAME—*for what office the ballot was intended.* Where the name of a candidate for the office of county treasurer is erased, and the name of the opposing candidate is written above the words "For county treasurer," the ballot may be fairly construed as a vote for the candidate whose name is written above the designation of the office.

43. Where the ticket reads, "For county treasurer, Charles F. A. Behrensmeyer," after which is written "John Jimison," above the printed words "For county superintendent of schools," and the name "Newton J. Hinton," under those words, is erased in pencil, it will be considered as a vote for Jimison for county superintendent, and not as two votes for county treasurer.

44. At an election a few ballots cast had the printed name of the candidate for county treasurer, and no name was written immediately above or below the designation "For county treasurer," but the name of one of the candidates for county treasurer was written below the designation "For county superintendent of schools," and below the.name of the candidate for that office: *Held,* palpably no vote for county treasurer, and two ballots for county superintendent of schools, and that no other evidence of the intention of the voter was admissible.

45. Where the name of the office is completely cancelled, and the name of one of the candidates is written beneath the cancelled name of the office, the ballot will not be counted for such candidate.

46. But when in a ballot the name of a candidate is written into the title of the office, obscuring and partially obliterating the letters designating the name of the office, it may be explained, and shown whether this was accidental and unintentional, and hence no cancellation.

47. SAME—*torn ballot, whether to be counted.* Where a ballot is found in the box torn in two from top to bottom, across all the names of the candidates, one part of which bears the ballot number, in the absence of any proof to the contrary a cancellation of the ballot will not be presumed, but on the contrary, it will be presumed the tearing was accidental. It may, however, be proved that the tearing was by the voter, and intentional, and upon such proof the ballot will be held to be cancelled.

48. NATURALIZATION—*proof by secondary evidence.* Records of naturalization are in nowise different from other records. When destroyed, secondary evidence of their contents may be given, the same as of the contents of any other record.

APPEAL from the County Court of Adams county; the Hon. B. F. BERRIAN, Judge, presiding.

Charles F. A. Behrensmeyer filed his petition in the county court of Adams county, on the 26th of November, 1886, to contest the election for the office of county treasurer of that county, to which John B. Kreitz had been declared elected by the canvassing board.

It is alleged in the petition, that the petitioner had been, and on that day was, and from thence hitherto has been, and he still is, an elector of Adams county, Illinois; that he was an elector of said county at the date of the election next here-after mentioned; that on November 2, 1886, in pursuance of law, an election was held in said county, for, among other offices, that of county treasurer of said county; that the said election was held at the various election precincts and districts in said county, the polls having been opened at each such precinct and district according to law; that in said several and respective precincts and districts, ballots were, at said election, received for said office of county treasurer; that after the polls were closed, a count was made by the judges of election of and at the respective precincts and districts aforesaid, of the votes and ballots at each of said election precincts and districts cast; that upon such count, the judges of the respective precincts and districts aforesaid, made certificate of the number of votes cast for the several and respective persons voted for for the different offices, including therein the said office of county treasurer, as said votes were counted by said judges, and said judges of said respective precincts and districts thereupon caused the ballot-boxes containing the ballots voted in the said respective precincts and districts, with their said certificate of the number of votes cast, last above named, to be forwarded to the county clerk of Adams county, Illinois, who, together with two justices of said county, within four days of said election, opened the returns of said election and can-

vassed the same, as required by law. It is further alleged, that at said election your petitioner was the republican candidate, John B. Kreitz was the democratic, and B. L. Dickerman the prohibition candidate for the office of county treasurer, aforesaid, and that said Kreitz had 4618 votes, your petitioner 4604, and said Dickerman 272 votes for the last named office, as the result was declared by said canvassing board, and that upon the result, as last above named, the county clerk of said Adams county issued and delivered to said Kreitz a certificate of election to the office of treasurer, aforesaid; that on information and belief, the canvassing board reached that result by adding together the votes for candidates for county treasurer as the same were stated in the certificate of the judges of the respective precincts and districts aforesaid, and that any errors in the count of the election judges entered into the result as declared by said canvassing board. The names of the precincts in the county of Adams outside of Quincy are then stated, and that the town of Quincy was divided into sixteen election districts, numbered from 1 to 16, both inclusive, after which it is further alleged, that at Melrose precinct fourteen or more votes were cast at said election for, and intended for, contestant, and which ought to have been counted for him, but which the judges refused to count, and did not count for him, and that said last named judges counted for Kreitz eight votes or upwards cast for contestant, and which ought to have been counted for contestant for said treasurer; that William Childers voted at Melrose, and was an illegal voter; that at Burton three votes cast for contestant, for said treasurer, and which ought to have been counted for petitioner, the judges of election refused to and did not count for him, and that they, by mistake, counted five or more votes for Kreitz for that office, cast for contestant; that at Ursa precinct sixteen legal votes, and at Mendon nine legal votes, and at McKee five legal votes, and at Honey Creek nine legal votes, and at Liberty five legal votes, and at Richfield ten legal votes, and

at the third district of Quincy ten legal votes, and at the fifth district of Quincy ten legal votes, and at the sixth election district of Quincy eight legal votes, and at the tenth district of Quincy twelve legal votes, and at the twelfth district of Quincy twelve legal votes, and at the fourteenth election district of Quincy five legal votes, and at the fifteenth election district of Quincy sixteen legal votes, and at the sixteenth election district of Quincy twelve legal votes, were cast for contestant for said treasurer, which the judges of election of the respective precincts and districts ought to have counted for contestant, but refused to count, and did not count for him for said office. And it is further alleged, on information and belief, that at each of said last fourteen precincts and districts, votes for contestant, for said office, were actually counted for Kreitz by the election judges, the precise number of which is unknown to contestant, but which he asks to have ascertained by a recount; that F. C. Inman voted illegally at the third district of Quincy for Kreitz for treasurer, and that he was not twenty-one years of age when he so voted; that at Liberty three persons voted illegally for Kreitz for treasurer, but contestant has not yet been able to ascertain their names; that at Liberty more ballots were in the ballot-box than on the poll-list, and that the judges of said precinct did not correctly count the ballots of the precinct; that at the tenth district of Quincy the judges found among the ballots two folded together, both for contestant,—one numbered and one not,—and that the judges threw out both, and did not count either ballot; that at each of the election precincts and districts of Adams county other than those above named, there were cast divers legal votes for contestant, for treasurer, which the judges of the respective precincts and districts refused to count for him for treasurer, which ought to have been counted for him, and that at each of the precincts and districts last named, votes cast for contestant, for said treasurer, were, by the judges of election thereof, counted by mistake for Kreitz for that office;

that at some of the precincts and districts of said Adams county, other illegal votes than those above named were cast by persons not legal voters, for Kreitz, for said office of treasurer, and counted by the election judges for him; that the judges of election of the several election precincts in Adams county made mistakes in counting the ballots cast for treasurer at the respective precincts as existing at said election.

The answer of the defendant denies that petitioner, on January 1, 1886, and from that time to and inclusive of the date of election, on November 2, 1886, was an elector of Adams county, Illinois; admits that an election was held for county treasurer of that county on November 2, 1886, in said county, and that at said election the polls were open at each of the voting precincts of said county, and that ballots were cast and received thereat; admits that after the polls were closed a count was made by the judges of the different precincts, of the votes cast thereat, and that upon such count being made in each precinct, the judges thereof certified the number of votes cast for the different persons voted for, for the different offices, including therein the office of county treasurer, as the votes were counted by said judges; admits that said judges of said precincts, except in the case of the township of Ellington, thereupon caused the ballot-boxes containing the ballots voted at said respective precincts, with their said certificate of the number of votes cast thereat, to be forwarded to the county clerk of said Adams county, and that said clerk and two justices afterwards, and within four days of said election, opened the returns of said election from all said precincts, including Ellington, and canvassed the same. It further admits that petitioner was the republican and B. L. Dickerman the prohibition and respondent the democratic candidate for said county treasurer, and that the result of the election, as declared by said canvassing board, was 4618 votes for Kreitz, 4604 votes for contestant, and 272 votes for Dickerman, and that said county clerk issued to respondent a certificate of election; that

the said canvassing board merely added together the result as
certified by the judges of the different precincts, as to county
treasurer; denies that any errors and vices entering into the
result as certified by the judges, were preserved in the result
as announced by the canvassing board; avers that there were
no errors or irregularities in said returns as certified by the
election judges, except as hereinafter stated; admits that the
precincts and election districts of the county are as set out in
the petition of contestant; denies that at Melrose precinct
fourteen or more legal votes were cast for Behrensmeyer which
ought to have been counted for him, which the judges refused
to count for him; denies that at Melrose the judges counted
eight or more votes for Kreitz which belonged to Behrensmeyer,
and asserts that the judges of Melrose counted every vote there
cast for him, and denies that William Childers was an illegal
voter; denies that at Burton three or more votes were cast for
Behrensmeyer which the judges refused to count for him, and
denies that the judges of Burton precinct counted five or more
votes for Kreitz which were cast for contestant; denies that
at Ursa, Mendon, McKee, Honey Creek, Liberty, Richfield,
the third, fifth, sixth, tenth, twelfth, fourteenth, fifteenth and
sixteenth districts of Quincy, legal votes were cast for Behrens-
meyer and not counted by the judges of election for him, and
avers that at each of the last named precincts the judges
counted for Behrensmeyer every vote cast for him, and cer-
tified the same correctly to the county clerk; denies that at
each of the fourteen precincts last named there were ballots
cast for Behrensmeyer which the judges counted for Kreitz;
denies there should be a recount; denies that F. C. Inman,
voting at the third district of Quincy, was an illegal voter,
under twenty-one years of age, but asserts he was twenty-one
years of age; denies that at Liberty three illegal votes were
cast and counted by the judges for Kreitz, for said treasurer,
and avers that no illegal votes were cast at Liberty precinct
for Kreitz, and denies that there were more ballots in the box

containing the ballots cast than shown on the poll-books, and denies that the ballots were not correctly counted by the judges of that precinct; denies that at the tenth district of Quincy, on counting the ballots cast, the judges found two ballots folded together, both for Behrensmeyer,—the outside one numbered, —and that the judges did not count either ballot; denies that at each of the other election precincts of said Adams county than those specifically mentioned by petitioner in his petition, there were cast any legal votes for Behrensmeyer for said treasurer which ought to have been counted for Behrensmeyer and which the judges of election refused to count for him, and denies that at the last named precincts, or at any other, there were cast for Behrensmeyer, votes which the judges, by mistake, counted for Kreitz for said office; denies that at any precinct of said county any illegal votes were cast for Kreitz for treasurer; denies that the judges at said respective election precincts counted any votes for Kreitz not legal votes; denies any mistakes of the election judges in counting, to the prejudice of petitioner; avers that any mistakes of the judges in counting votes were to Kreitz's prejudice; denies that a recount would disclose mistakes prejudicial to Behrensmeyer; denies that Behrensmeyer was, at said election, elected to the said office of treasurer, and denies that Kreitz was not elected; avers that Kreitz was elected by a plurality of the legal votes cast at said election, and avers that Behrensmeyer did not receive a larger number of votes than defendant; denies that petitioner is entitled to the relief prayed. It then avers that at each precinct and district in said county, ten legal votes were cast for defendant for treasurer which ought to have been counted for Kreitz, but which the judges refused to count for him, and that at each precinct and district last aforesaid, the judges of election counted ten votes for petitioner which ought to have been counted for Kreitz; that at each and every of the election precincts and districts last aforesaid, four unnumbered ballots were found, each folded within a numbered bal-

lot, and that each numbered and unnumbered ballot was for Kreitz; that in each of said ballot-boxes, in addition, four unnumbered ballots were found, two of said unnumbered ballots being inclosed within a numbered one, and the other two of said last named four unnumbered ballots were folded within another numbered ballot, and that each numbered as well as unnumbered ballot was for Kreitz for treasurer, and that in addition, three additional unnumbered ballots were found in each ballot-box, said three unnumbered ballots being folded within a numbered ballot; that each of the numbered and unnumbered ballots was for Kreitz for treasurer; that the judges of election threw out the numbered ballots with the unnumbered, and not because of any excess of ballots over the names on the poll-books, or because cast by persons not entitled to vote; avers that the ballots so thrown out ought to have been counted for Kreitz; avers that over and above the illegal votes hereinafter mentioned, ten illegal votes were counted by the judges for Behrensmeyer for the said office of treasurer; avers that in Keene precinct, after the polls closed on November 2, 1886, and its ballot-box had been opened, a person not a judge, clerk or challenger was admitted to the room, and while then and there, unauthorized, under the statute, and unsworn, took the place of a clerk of the election, the clerk leaving the room; that such person participated in the count, and then and there made a tally-sheet, and kept tally of the votes as called off by the judges of the election, and that all the other tally-sheets made by the judges and clerks of the precinct were made and copied from that one; alleges that said substitution for said clerk was unlawful, to the injury of defendant, and in fraud of his rights, and that the vote of this precinct should be excluded from the returns for treasurer; avers that in Ellington, after the polls closed and the ballot-box was opened, a person not a judge or clerk or challenger was admitted to the room, and though unsworn, participated in the counting of the ballots, and handled the same, read the names

therefrom, and assisted in stringing them; avers that after the ballots had been counted and strung, and partly sealed in an envelope for that purpose, and placed in possession of a judge of the precinct, the returns from Ellington were not accompanied by the ballots, but that the ballots remained in the judge's possession one or two days after the certificate, tally-sheet, poll-books and other returns had been returned to the county clerk, and that when the ballots were returned to such clerk they were returned by a daughter of said judge, who was not an elector, and the ballots were then and there, with the envelope which had formerly inclosed them, wrapped in a newspaper, with the envelope torn and muddy; said ballots, if all of them were returned, were not returned as is by law directed; avers that the person admitted to the room, and the judge having the ballots, were not friendly, politically, to the defendant, and that Ellington township ought to be excluded from the returns for treasurer in consequence; avers that at the eleventh district of Quincy, when the polls closed, some of the clerks and judges removed the ballot-box containing the votes cast in said precinct, to the private house of one of the clerks of election, while the other judges and clerks went home, and after an absence of some time, met at said house and counted and canvassed the votes; that during said count, the judges of election, or one of them, found two unnumbered ballots, each folded in a numbered ballot, and destroyed them, and did not take them into account at all; that said unnumbered and numbered ballots were not destroyed because of an excess of ballots over names of the poll-list, nor for any legal or valid reasons; avers that while the election was being held, an elector presented his ballot, having the name of defendant on it for treasurer, to the judges, for the purpose of putting it into the ballot-box; that a judge, instead of putting it in the box, laid it aside, and never did put it in the box, and that the elector was thereby deprived of his vote; that none of the judges and clerks of this precinct were friendly to defendant,

politically; that for the acts last named, the returns of the
precinct ought to be excluded; avers that in the tenth district
of Quincy the judges of election, after the polls were closed and
the ballot-box was opened and the count entered on, found two
unnumbered ballots, each folded in a numbered ballot, and all
of the four ballots having defendant's name for treasurer, and
the judges destroyed the four ballots and did not také either
into áccount, and that for this reason the votes of the precinct
should be excluded from the returns for treasurer; avers that
if the vote of the tenth and eleventh districts be not excluded,
in that event the numbered ballots inclosing the unnumbered
ballots so destroyed, should be counted for defendant; avers
that in each election district, over and above the unnumbered
ballots already mentioned, the judges found in each precinct
two other unnumbered ballots, each folded within a numbered
one, the numbered and unnumbered one being for defendant
for treasurer, and that the judges of each precinct destroyed
both the numbered and unnumbered ballots in each case, and
not for any excess of ballots over names on the poll-list, nor
because cast by illegal voters; avers the following illegal voters
voted for Behrensmeyer in the first district of Quincy, to-wit:
Henry P. Williams, Ebenezer Barker, William Adcox, Sam
Barnum, Edward Janes, James Kennedy, L. W. Bryson, Fred
Bewer, William Heuter, Lester Janes and William Burall;
avers the following illegal voter voted for Behrensmeyer in
the second district of Quincy, to-wit: A. S. Sissiley; avers the
following illegal voters voted for Behrensmeyer in the third
district of Quincy, to-wit: D. L. Lyons, Bernard Kessing;
avers the following illegal voters voted for Behrensmeyer in
the fifth district of Quincy, to-wit: Thomas S. Kelley, G. C.
Weisner; avers the following illegal voters voted for Behrens-
meyer in the sixth district of Quincy, to-wit: Fred Zang,
Charles Wermker; avers the following illegal voters voted for
Behrensmeyer in the ninth district of Quincy, to-wit: T. W.
Weishner, A. F. Boehme, Christ Lebrosse, John Boll, Anton

Zatory, William Fenkhams and Henry Knapheide; avers the following illegal voters voted for Behrensmeyer in the tenth district of Quincy, to-wit: Henry Zink, Frederick W. Sturhahn; avers the following illegal voters voted for Behrensmeyer in the eleventh district of Quincy, to-wit: August Lucke, Philip Hocker, R. J. Crook, August Prante, Fred Prante, Gottlieb Bogy, Henry Graewe, Henry Buckmeyer, Henry Sunderman, H. Strottmeyer and W. H. Hillborn; avers the following illegal voters voted for Behrensmeyer in the fourteenth district of Quincy, to-wit: Silas Bogarth, R. V. McKinsons, Charles Sanders, Walter Terrill; avers the following illegal voters voted for Behrensmeyer in the fifteenth district of Quincy, to-wit: Lea Jackson, John Mitchell, . . . . . Bassett, . . . . . Brown, Allen Crosby, . . . . . Craver, George Buehner and Larkin Gardner; avers the following illegal voters voted for Behrensmeyer in Ellington precinct, to-wit: Isaac Voorhies, William Pfanschmidt, Louis Steffen, Mathias Wright, Louis Kruse and Henry Luecke; avers the following illegal voter voted for Behrensmeyer in Gilmer precinct, to-wit: William Ferguson; avers the following illegal voters voted for Behrensmeyer in Ursa precinct, to-wit: August Ipperson and David Hess; avers the following illegal voter voted for Behrensmeyer in Honey Creek precinct, to-wit: T. A. Melvin; avers the following illegal voter voted for Behrensmeyer in Payson precinct, to-wit: Fred Dickman; avers the following illegal voter voted for Behrensmeyer in Richfield precinct, to-wit: Albert Moore; avers the following illegal voter voted for Behrensmeyer in Concord precinct, to-wit: Henry Hoeckord; avers the following illegal voters voted for Behrensmeyer in Clayton precinct, to-wit: James Lovegood, John Hasset and John Mintz. The answer then denies that contestant was, in fact, elected treasurer, or that such fact would appear on a recount, and avers that contestant and contestee, by the returns of the canvassing board, received an equal number of votes for treasurer at the first district of Quincy; that in the fifth precinct, contestant, by

the returns of said board, had six more votes than contestee
for treasurer, and in the sixth district of Quincy thirty-nine
more votes than contestee, and in the seventh district of Quincy
contestant had twenty-five more votes than contestee, and in
the eighth district nine more votes than defendant, and in the
ninth district one hundred and seventeen more votes, and in
the tenth district of Quincy contestant had one hundred and
ninety-one more votes than defendant, and in the eleventh
district one hundred and seven more votes, and in the thir-
teenth district eleven more votes than defendant for treasurer;
that in North-east, contestant had twenty-three more votes,
in Keene twenty-one more votes, in Ursa thirteen more votes,
in Mendon fifty-seven more votes, in Camp Point eighty-one
more votes, in Clayton eighty-one more votes, in Ellington
fifty-eight more votes, in Gilmer three more votes, in Beverly
twenty-six more votes than defendant, for treasurer; avers,
besides the inaccuracies in counting said votes, canvassing and
reporting the same, in this answer mentioned, that in each of
said last nine districts of Quincy and nine townships, the votes
of the electors voting were, as to defendant, incorrectly, falsely
and fraudulently cast, counted, canvassed and reported or re-
turned; that in each of said nine townships and nine precincts
last named, on the day of election, divers false and fraudu-
lent tickets, gotten up and designed by the friends, agents and
political partisans of contestant to deceive, and for the pur-
pose of defrauding, the electors of said precincts or districts
and townships out of and in the expression of their choice of
candidates for said office of treasurer, were, by such friends,
agents and political partisans of petitioner, prepared and made
to resemble and counterfeit the democratic ticket used at said
election, with the exception of the substitution of petitioner's
name for that of defendant thereon for treasurer, and certain
other slight but unnoticeable differences, and that such tickets
were, on the day of election, by the friends, agents and polit-
ical partisans of contestant, distributed, circulated and deliv-

ered to the voters in said nine townships and nine precincts, with intent to defraud the electors, and induce them to deposit tickets at the several polling places containing contestant's instead of defendant's name for county treasurer, and that many electors in said nine townships and nine precincts or districts were induced to vote said false and fraudulent tickets, believing, and induced to believe by fraud and contrivance, that said false and fraudulent tickets were the tickets of, and authorized and distributed by, the democratic party, through its authorized agents, for use at said election, and that said tickets contained the names of all the candidates for the respective offices thereon named, of the democratic party; that the name of defendant was not thereon, and defendant avers that by reason of said false and fraudulent tickets and acts, the electors of said nine townships, and each of them, and said nine precincts, and each of them, were defrauded, and · the expression of the will of said electors, by their ballots cast at said election, was falsified, and that by reason thereof and thereby the vote of the electors of said nine precincts or districts, and said nine townships, and the count made thereof, and the return and report thereof, are not the votes of said electors, and a count and return of such vote; denies that the petitioner is entitled to the relief prayed, and says the petition was not brought and filed to the proper term of court, and that summons issued to a probate term instead of a law term of the county court.

There were no exceptions to the answer, but a general replication by contestant was filed January 13.

Mr. C. A. BABCOCK, and Messrs. CARTER & GOVERT, for the appellant:

JURISDICTION :—The county court had no jurisdiction to hear this cause at a probate term, and the petition should have been dismissed. *East St. Louis* v. *Wittich,* 108 Ill. 449.

RECOUNT:—A recount of the ballots cast at an election will not be ordered unless some specific fraud or mistake is pointed out in the particular box to be examined. There must be charges sufficiently precise to induce the court to entertain the complaint, and a general allegation of errors believed to exist is not sufficient. *Thompson* v. *Ewing*, 1 Brewst. 67; *Kansas case*, 2 Pars. 599.

The count made at the closing of the polls, before it is known how many ballots must be changed to affect the vote, is better evidence than any subsequent recount, unless it be shown affirmatively that the ballots have been properly handled, preserved, sealed up, and continually in the possession of the custodians of the law, and that no opportunity has been given for tampering with them. Cooley's Const. Lim. (1st ed.) 625; *People* v. *Burden*, 45 Cal. 241; *Hudson* v. *Solomon*, 19 Kan. 177; McCrary on Elections, (2d ed.) 249.

Testimony of voters that they voted a certain kind of ballot or ballots for a certain individual, and that such ballots are not among the ballots returned, is legitimate to attack a return or recount. *Reid* v. *Julian*, 2 Bart. 822; *Loyal* v. *Newton*, 1 id. 522; McCrary on Elections, (2d ed.) 386.

RESIDENCE OF VOTER:—Residence, to constitute one a voter, must be a home without any present intention of leaving it for another; but once having acquired a home, it will continue, until, by a coincidence of act and intention, it is abandoned for another. Cooley's Const. Lim. (1st ed.) p. 600; *Smith* v. *People*, 44 Ill. 16, and cases there cited.

Determination to change one's residence, and sojourn at the contemplated place of residence, with renting of a house there for an indefinite duration, followed by removal of family or household effects, operates a change of residence when the family or effects are removed, and not until then. *Williams* v. *Whiting*, 11 Mass. 424; *Sanders* v. *Getchell*, 76 Me. 158.

Leaving one's home with contemplation of possible abandonment of it, will not lose a residence; nor when a home is

abandoned for another will contemplation of possible return retain it. The residence is where one has settled himself and his home interests, with no present intention of leaving it. *Dale* v. *Irwin*, 78 Ill. 181; *Hayes* v. *Hayes*, 74 id. 312; *Wilkins* v. *Marshall*, 80 id. 74.

That place to which one returns when temporary employments are ended,—the seat of one's affections and interests,—is one's residence, within the meaning of the Election law. Appendix to McCrary on Elections, 449.

NATURALIZATION:—The illegitimate minor child of his reputed father, living in the father's family, the mother being the father's wife, becomes a citizen by reason of the naturalization of the reputed father,—not because the mother is the wife of a citizen. *Dale* v. *Irwin*, 78 Ill. 186.

There may be a presumption in favor of one foreign born, who votes, that he has been naturalized; but the difficulty of proving a negative is such, and the proof lying so peculiarly within the knowledge of the person naturalized, but little is required to shift the burden of proof to the party to prove by a certified copy of the record that he was naturalized. McCrary on Elections, (2d ed.) 294.

FOR WHOM VOTING, AND FOR WHAT OFFICE:—The middle initial letter, in law, is no part of one's name. It may be changed or disregarded at pleasure. *Humphreys* v. *Phillips*, 57 Ill. 132; *Erskine* v. *Davis*, 25 id. 251.

The law knows only one christian name. The giving of a wrong initial to a middle name will not defeat the ballot. Cooley's Const. Lim. (1st ed.) pp. 608, 609.

The testimony of a voter can not be received to explain a ballot otherwise fatally defective, or that he voted the particular ballot and intended it for a particular candidate. The intention of the voter must be that which is expressed in due form of law, not that which remains hidden in his breast. Cooley's Const. Lim. 611.

11—125 ILL.

The paper ballot is to prevail as the highest evidence of his intention. *City of Columbus* v. *Dahn*, 36 Ind. 335 ; *People* v. *Higgins*, 3 Mich. 232 ; *Beardstown* v. *Virginia*, 76 Ill. 49.

Proof offered in regard to the ballot which had upon it the names of both the relator and defendant, was properly rejected. The intention of the voter can not thus be inquired into, when it is opposed or hostile to the paper ballot which he cast. *People* v. *Seaman*, 5 Denio, 412 ; *People* v. *Tisdale*, 1 Doug. 65.

A ballot containing a name for an office will not be counted for a candidate for the same office whose name is dissimilar in spelling and sound,—as, ballots for Tallaton, Talkaton and Takton, will not be counted for Talkington. *Talkington* v. *Turner*, 71 Ill. 237.

If more persons are designated for an office than there are candidates to be elected, such part of the ticket will not be counted for either of the candidates. Starr & Curtis' Stat. p. 1009, chap. 46, sec. 59 ; *Clark* v. *Robinson*, 88 Ill. 500 ; *People* v. *Seaman*, 5 Denio, 412.

Mr. WILLIAM McFADON, for the appellee :

NATURE OF PROCEEDING :—The proceeding under the statute to contest an election is in the nature of a chancery proceeding, and to be governed by the rules of chancery practice. Rev. Stat. 1874, chap. 46, secs. 113-116 ; *McKinnon* v. *People*, 110 Ill. 306 ; *Kingery* v. *Berry*, 94 id. 518; *Dale* v. *Irwin*, 78 id. 171 ; *Talkington* v. *Turner*, 71 id. 234.

JURISDICTION :—The jurisdiction to try a contest over the office last named is conferred upon the county court. (Rev. Stat. 1874, chap. 46, sec. 98.) And from the county court a summons must issue against the person whose office is contested. Rev. Stat. 1874, chap. 46, sec. 114.

This summons was properly made returnable to the first term of the county court. Rev. Stat. chap. 37, sec. 112; chap. 110, sec. 1; chap. 22, sec. 8; *Zimmerman* v. *Cowan*, 107 Ill. 637.

The county court has jurisdiction of a contest case at a probate term. Rev. Stat. chap. 37, secs. 5, 6, 7; *Kingery* v. *Berry*, 94 Ill. 517; *Clark* v. *Robinson*, 88 id. 500.

OF THE ANSWER:—The proceeding being in the nature of a suit in chancery, the rules of chancery practice must govern as to the answer. *Dale* v. *Irwin*, 78 Ill. 170.

By these rules the defendant is bound to disclose in his answer his defenses, and he is confined, on a trial, to the defenses set up in his answer. 1 Daniel's Ch. Pr. (4th Am. ed.) p. 712; *Stone* v. *Moore*, 26 Ill. 171.

The defendant can not avail himself of any matter in defense which is not stated in his answer, even though it should appear in evidence. *Talkington* v. *Turner*, 71 Ill. 236; 1 Daniel's Ch. Pr. (4th Am. ed.) p. 712; *Westlake* v. *Horton*, 85 Ill. 228.

Upon the question of frauds in an election contest, the appellant is confined to such, if any, and such only, as he may have set up in his answer. McCrary on Elections, (2d ed.) sec. 281, and cases cited; *Carpenter's case*, 2 Pars. 537; *Applegate* v. *Eagan*, 74 Mo. 265.

In his answer appellant was bound to mention the names of the voters whose votes he intended to challenge as illegal, and on the trial of the cause he should have been confined to those named in his answer. *Applegate* v. *Eagan*, 74 Mo. 265; *Griffin* v. *Wall*, 32 Ala. 149; *Norwood* v. *Kenfield*, 30 Cal. 400.

RECOUNTING THE BALLOTS:—Under the statute, a recount of the ballots on an election contest is an absolute right given to the contestant. Rev. Stat. chap. 46, sec. 60.

If any action of the court were required, the petition of appellee contained allegations amply sufficient to have required the court to order the recount. Rev. Stat. chap. 46, sec. 113; *Dale* v. *Irwin*, 78 Ill. 170; *Talkington* v. *Turner*, 71 id. 235; *Skerrett's case*, Brightley's Election Cases, 320; McCrary on Elections, sec. 344; *Kirk* v. *Rhodes*, 46 Cal. 398.

NATURALIZATION:—A certificate of naturalization is conclusive evidence of a legal naturalization; and the findings of

such court as to the question of prior residence, or the previous declaration of the party, or the time of such application, or as to any other facts recited in the record, is conclusive. *People* v. *McGowan,* 77 Ill. 647; *Spratt* v. *Spratt,* 4 Pet. 393; *State* v. *Olin,* 23 Wis. 310; *McCarthy* v. *Marsh,* 5 N. Y. 263; *Campbell* v. *Gordon,* 6 Cranch, 182.

By the laws of the United States, any woman who may herself be lawfully naturalized, (and such is any alien-born free white woman,) upon her marriage to a citizen of the United States becomes and is deemed to be a citizen of the United States. 10 U. S. Stat. at Large, p. 604; *People* v. *Newell,* 8 Hun, 78; *Luhrs* v. *Eimer,* 80 N. Y. 173; *Kelley* v. *Owen,* 7 Wall. 491.

The act applies to any case of marriage by such woman, to a citizen of the United States, and whether such citizenship existed before the passage of the act of 1855, or by the subsequent naturalization of the husband. *Headman* v. *Rose,* 63 Ga. 458; *Kelley* v. *Owen,* 7 Wall. 496; *Renner* v. *Muller,* 44 N. Y. 535.

The minor children of such woman, residing in the United States at the time of such marriage, though by her former husband, upon her marriage with such naturalized citizen become citizens of the United States, and entitled to vote. *United States* v. *Kellar,* 11 Biss. 314; *People* v. *Newell,* 8 Hun, 78.

Such admission to citizenship on the part of the mother has the same force and effect as if such woman had been naturalized by the judgment of a competent court. *Leonard* v. *Grant,* 5 Fed. Rep. 11.

Without question, the naturalization of a mother by the judgment of a competent court, would carry with it the citizenship of her minor children dwelling in the United States at the time of such naturalization. *People* v. *Newell,* 8 Hun, 78; Rev. Stat. U. S. sec. 2172.

By the laws of Congress in force from April 14, 1802, to the present time, the minor children of a naturalized alien (these

children being under the age of twenty-one at the time of his naturalization) became and are citizens of the United States. Rev. Stat. U. S. sec. 2172; *Beardstown* v. *Virginia*, 81 Ill. 543; *Dale* v. *Irwin*, 78 id. 186.

RESIDENCE OF VOTER:—A party leaving the State without any settled intention of acquiring a residence elsewhere, but only with a conditional intention of doing so, does not lose his residence in Illinois so long as that intention remains conditional. *Wilkins* v. *Marshall*, 80 Ill. 77; *Potts* v. *Davenport*, 79 id. 456; *Smith* v. *People*, 44 id. 16; *Hayes* v. *Hayes*, 74 id. 312; *Kitchell* v. *Burgwin*, 21 id. 40.

A voter removing to another State with his family, with the intention of not remaining there unless it suited, and returning because not suited, does not lose his right to vote here. *Ives* v. *Mills*, 37 Ill. 73; *Kitchell* v. *Burgwin*, 21 id. 41; *Beardstown* v. *Virginia*, 81 id. 543; *Harbaugh* v. *Cicott*, 33 Mich. 252.

The intention of a party has a controlling force in determining the question of his residence. *Cobb* v. *Smith*, 88 Ill. 201; *Wilkins* v. *Marshall*, 80 id. 78; *Fish* v. *Inhabitants of Chester*, 8 Gray, 508.

The place where a person has voted is to be taken as his place of residence, in the absence of irresistible proof to the contrary. *Cobb* v. *Smith*, 88 Ill. 201.

One born and brought up at the home of his parents, in Adams county, Illinois, has his domicile at the home of his parents. That is the domicile of origin of the one so born and brought up, and the domicile of origin continues until a new one is acquired; and temporary absence from such domicile will not work a change of domicile with reference to the right of suffrage. *Reed's Appeal*, 71 Pa. St. 383; *Abingdon* v. *North Bridgewater*, 23 Pick. 177; Story on Construction of Laws, (7th ed.) sec. 46; *State* v. *Judge*, 13 Ala. 806; Brightley's Election Cases, p. 113; *Lincoln* v. *Hapgood*, 11 Mass. 350.

A residence is lost only by a union of act and intention. (*Smith* v. *People*, 44 Ill. 16.) And a domicile once acquired

continues until a new one is acquired.   *Jennison* v. *Hapgood,*
10 Pick. 77.

To prove a change of domicile, it must be made to appear,
not only that the old domicile has been abandoned, but that a
new one has been acquired; and though there be an intent to
abandon a domicile, and actual residence at another place, yet
unless coupled with that actual residence there be an intention
on the part of the person so residing of remaining permanently,
or at least for an indefinite time, no change of domicile has
occurred.   *Jennison* v. *Hapgood,* 10 Pick. 77.

FOR WHOM VOTING—AND FOR WHAT OFFICE:—When the ques-
tion is for what or for whom a ballot should be counted, the
intention of the voter should, if possible, be ascertained, and
that intention must control.  *McKinnon* v. *People,* 110 Ill. 306;
*People* v. *Matteson,* 17 id. 167; *Carpenter* v. *Ely,* 4 Wis. 420.

To the end that the intention of the voter may be ascertained,
parol evidence is admissible to show the general circumstances
surrounding the election,—as, for instance, who the candidates
brought forward by the nominating convention were, and for
what offices they were each running.  *McKinnon* v. *People,*
110 Ill. 306; McCrary on Elections, (2d ed.) p. 339; *Attorney
General* v. *Ely,* 4 Wis. 420; *Clark* v. *Robinson,* 88 Ill. 498;
*State ex rel.* v. *Foster,* 38 Ohio St. 604; Cooley's Const. Lim.
p. 611; *State* v. *Gates,* 43 Conn. 533; *State ex rel.* v. *Gold-
thwait,* 16 Wis. 146; *State ex rel.* v. *Elmwood,* 12 id. 615;
*Carpenter* v. *Ely,* 4 id. 420; *Bashford* v. *Barstow,* id. 567.

The ascertainment of the voter's intention, as expressed by
his ballot, being the object aimed at by courts, if the ballot
produces a reasonable conviction as to the voter's intent, effect
should be given that intention, notwithstanding technical in-
accuracies in spelling, or otherwise.  *State ex rel.* v. *Foster,* 38
Ohio St. 604; *Hawes* v. *Miller,* 56 Iowa, 395; *Strong, Peti-
tioner,* 20 Pick. 494.

Courts will give effect to such intention as is apparent on the
face of the ballots, and count it for the proper candidate, un-

less so to apply it would be to contradict the ballot itself, or unless the ballot is so defective that it fails to show any intention whatever. Cooley's Const. Lim. (3d ed.) 611; *McKinnon* v. *People,* 110 Ill. 307.

While parol evidence is admissible to show the facts and circumstances surrounding an election, that the court may interpret the ballot in the light of these facts, it is never admissible to prove that a voter who has written "Smith" on his ballot meant "Jones." Cooley's Const. Lim. (5th ed.) 612, 620; *Gilliland* v. *Schuyler,* 9 Kan. 569; *Beardstown* v. *Virginia,* 76 Ill. 48.

Nor will parol evidence be admitted to prove that a ballot on which the name of the candidate for the office of treasurer is erased, was intended by the voter as a ballot for such candidate. *Moffat* v. *Montgomery,* 68 Mo. 163.

Where, upon a printed ticket containing the name of John B. Kreitz, in print, for the office of county treasurer, the voter has written in, in pencil, the name of appellee, without erasing the printed name of Kreitz, this shall not be taken as a designation of two persons for the same office, but the writing shall prevail as the highest evidence of the voter's intention, and the ballot shall be counted for the candidate whose name is written in, in pencil. McCrary on Elections, sec. 409; *People* v. *Saxton,* 22 N. Y. 311.

A ballot in which the name of the appellee is written over the printed words, "For county treasurer," so that the ballot reads, "Charles F. A. Behrensmeyer, for county treasurer," instead of, "For county treasurer, Charles F. A. Behrensmeyer," ought to be counted for appellee for that office. McCrary on Elections, (2d ed.) sec. 397.

The printed name of one candidate pasted over the name of a candidate on another ticket, is an erasure of the name over which it is pasted. Cushing on Parl. Prac. sec. 106, p. 40; McCrary on Elections, sec. 410.

The declaration of a voter that he voted for a candidate other than the one found on his ballot, can not be received to contradict his ballot. *People* v. *Saxton*, 22 N. Y. 309; *People* v. *Seaman*, 5 Denio, 409; *Beardstown* v. *Virginia*, 76 Ill. 48.

When a patent ambiguity is raised in respect to the name upon a ballot, the party voting it may be allowed to state what he intended by the ballot. *McKinnon* v. *People*, 110 Ill. 308.

Unsworn declarations of voters, made after the election, as to how they voted, or as to their qualification as voters, are hearsay, and inadmissible on the question of the legality of the election. *Meservey's case,* Cushing's Election Cases, 201; *People* v. *Grand County Commissioners,* 7 Col. 190; *Beardstown* v. *Virginia,* 76 Ill. 48.

Upon the authorities as they stand in Illinois, declarations of a voter, to be admissible in evidence, must be a part of the *res gestæ,* and to be a part of the *res gestæ* they must have been uttered at the time his ballot was cast, and not before or after. *Beardstown* v. *Virginia,* 81 Ill. 550; *Inhabitants of Brookfield* v. *Warren,* 128 Mass. 288; *Gilliland* v. *Schuyler,* 9 Kan. 567; McCrary on Elections, (2d ed.) sec. 271.

But the declarations of a voter uttered at other times than the time of casting his ballot, are merely hearsay, and can not be given in evidence to the detriment of the party for whom he has voted. McCrary on Elections, (2d ed.) sec. 271; *Gilliland* v. *Schuyler,* 9 Kan. 569; *People* v. *Cicott,* 26 Mich. 283; *Wenner* v. *Eaton,* 34 N. W. Rep. 171; *Inhabitants of Brookfield* v. *Warren,* 28 Mass. 288.

DOUBLE BALLOTS:—Under the statute of 1885, a double ballot ought not to be counted at all, nor should either ballot thereof be counted for any one. Sess. Laws, 1885, pp. 195, 196, sec. 57; McCrary on Elections, (2d ed.) secs. 3-12; *West* v. *Ross,* 53 Mo. 354; *Ledbetter* v. *Hall,* 62 id. 424; *Webster* v. *Gilmore,* 91 Ill. 324.

Mr. Justice Scholfield delivered the opinion of the Court:

Before proceeding to the merits of the case, we must pass upon a question of jurisdiction and some questions of pleading and practice.

*First*—It is objected that the county court had no jurisdiction in the case, because the summons was returnable to a probate term instead of to a law term.

It is provided by section 5 of the "County Court act," (Rev. Stat. 1874, chap. 37, p. 339,) that "county courts shall have jurisdiction in all matters of probate; settlement of estates of deceased persons; appointment of guardians and conservators, and settlement of their accounts; all matters relating to apprentices; proceedings for the collection of taxes and assessments; and in proceedings by executors, administrators, guardians and conservators for the sale of real estate for the purposes authorized by law, and such other jurisdiction as is or may be provided by law,—all of which, except as hereinafter provided, shall be considered as probate matters, and be cognizable at the probate terms hereinafter mentioned." It will be observed that the words, "and such other jurisdiction as is or may be provided by law," are unrestricted, and may, therefore, have application to matters to be considered at the probate as well as at the law term of the court, and that the last sentence of the paragraph expressly provides that all of the matters of which the court may thus have jurisdiction, shall be, not matters of probate, but considered *as* probate matters, and *be cognizable* at the probate terms, except as thereinafter provided. Unless, therefore, it is in the statute expressly provided that contested elections shall be considered at law terms, it must follow, under this language, that they shall be considered at probate terms.

It is provided in section 7 of the same act, that "the county courts shall have concurrent jurisdiction with the circuit courts in all that class of cases wherein justices of the peace now

have or may hereafter have jurisdiction, where the amount claimed or the value of the property in controversy shall not exceed $1000; concurrent jurisdiction in all cases of appeals from justices and police magistrates, * * * and in all criminal offenses and misdemeanors where the punishment is not imprisonment in the penitentiary, or death, — all of which shall be cognizable at the law terms hereinafter mentioned." The words, "class of cases wherein justices of the peace now have or may hereafter have jurisdiction," mean actions at law. This is clear, both from the limitation of $1000 on the "amount claimed or the value of the property in controversy," which can have no application where no amount in money, and no property is sought to be recovered, and from the specific enumeration of the cases of which justices of the peace then had and still have jurisdiction, in section 13, chapter 79, page 639, of the Revised Statutes of 1874. Besides, from the very nature of chancery powers and jurisdiction, it would be absurd to assume that it could have been contemplated by the General Assembly that they would ever be conferred upon justices of the peace. We had decided, previous to the date of this enactment, and then held, that a proceeding to contest an election was not a suit at law. (*Moore* v. *Mayfield,* 47 Ill. 167; *People ex rel.* v. *Smith,* 51 id. 177.) There is plainly nothing in this section conferring general chancery powers upon the county court, and we know of no other section in which such powers are conferred, and to be exercised at the law terms.

The 113th section of chapter 40, of the Revised Statutes of 1874, entitled "Elections," provides that a person desiring to contest an election, etc., shall "file with the clerk of the proper court a statement in writing, * * * which statement shall be verified by affidavit, in the same manner as bills in chancery may be verified." Then sections 114, 115 and 116 provide for the issuing of summons, its service and return, the taking of evidence and the trial of the case, in like manner as in cases

in chancery; and there is no other provision of the statute in regard to the term to which the writ shall be returnable. The 98th section of the act simply says, "the county court shall hear and determine contests of election of all other county * * * officers,"—and that includes this office,—and says nothing about when the proceeding shall be heard. It must therefore inevitably follow that this proceeding shall be heard at the probate term, because there is no other term provided for its hearing.

*East St. Louis* v. *Wittich et al.* 108 Ill. 449, is supposed by counsel for appellant to be opposed to this view. We think otherwise. That was a proceeding, under chapter 24 of the Revised Statutes of 1874, to assess the cost of improvement of a certain street in East St. Louis, and the issues there must be tried by a jury. (See section 31, article 9, of the chapter.) And it is expressly provided that the hearing shall be conducted as in "*other cases* at law,"—and so we thought it followed it could only be tried at a law term. It may, moreover, be observed, that this objection does not question the jurisdiction of the court over the subject matter or the person, but simply denies that the court existed at the time to which the writ was returnable, for the purpose of such adjudication. If we shall admit that to be true, what follows? Simply, that the orders then made were a nullity. At the February term appellant answered. That was a law term, and, undoubtedly, the court then might adjudicate if the parties were before it. Had appellant failed to answer, or failed to obey any order of the prior term, and the court had then coerced him into obedience,—to doing that which it could not have compelled him to do but for the prior order,—the validity of the order at that term would be before us for investigation. But appellant might have answered without summons and without any previous order; and if the previous order is a nullity, he is to be assumed, in the absence of coercion, as having voluntarily answered. If he did so, the court thereafter had jurisdiction

of his person, and, having jurisdiction of the subject matter, it lawfully proceeded.

*Second*—It is objected that the court was not authorized by the pleadings, nor by the preliminary proof of the identity of the ballots, to decree an examination of the ballots. We are of opinion that it is not indispensable in such cases that the petition shall show the names of the persons whose ballots have been improperly counted. More particularity in pleading is not required than the nature of the subject is reasonably susceptible of, and it is obvious, in the very nature of things, that in most instances the candidate defeated by a miscount can not know whose ballots were miscounted. All he can be expected to know is, that about so many ballots were deposited for him at a given poll, and that the count does not agree therewith. If he knows more, it is accidental. Nor, in such case, is it of consequence whose ballot was miscounted, for the effect is the same, and the mode of proof is precisely the same, whether it was cast by one legal voter or another. It is, moreover, evident, that the information upon which the contestant acts, must, to a very great extent, be hearsay. He can not be expected to have been personally at each poll, much less to have known how each elector voted. Nor can he be expected to have personally supervised the counting at each poll,—and therefore, however grossly and palpably he may have been wronged at several polls, all that he can say truthfully in respect to most of it is, that he is informed and verily believes.

We are therefore of the opinion, that as to the polls, count, etc., at Melrose, Burton, Ursa, Mendon, McKee, Honey Creek, Liberty, Redfield, and the third, fifth, sixth, tenth, twelfth, fourteenth, fifteenth and sixteenth election districts of the city of Quincy, the petition is sufficient. As to the other polls, it clearly was not, had the objection been taken by demurrer, and adhered to. It is a clear and most palpable violation of the right of a secret ballot to allow a party, on mere suspicion, to have the ballots exposed and subjected to scrutiny to enable

him to find objections upon which to make a tangible charge. But appellant answered, and made issues of fact, and gave evidence upon the general and indefinite as well as the specific allegations of the bill, and thus waived the objection.

As respects the preliminary proof of the identity of the ballots, it is alleged in the petition that "said judges of said respective precincts and districts thereupon" (*i. e.*, after counting the ballots at the several polls) "caused the ballot-boxes containing the ballots voted in the said respective precincts and districts, with their said certificate of the number of votes, last above named, to be forwarded to the county clerk of Adams county, Illinois, who, together with two justices of said county, within four days of said election, opened the returns of said election, and canvassed the same, as required by law." Appellant, in his answer, admitted that "after the polls were closed a count was made by the judges; * * * that said judges of said precincts, except in the case of the township of Ellington, thereupon caused the ballot-boxes containing the ballots voted at said respective precincts, with their certificate of the number of votes cast thereat, to be forwarded to the county clerk of Adams county, and that said clerk and two justices, afterwards, and within four days of said election, opened the returns of said election from all said precincts, including Ellington, and canvassed the same." It is unnecessary to notice the answer as to Ellington, since appellant lost nothing by the recount of the vote at that poll, and was not, therefore, injured by it.

We think, under the admissions of the answer, the preliminary proof was sufficient. It does not follow, from the fact that ballots are ordered to be recounted, that all question of whether they have been tampered with is concluded. If the petitioner makes a *prima facie* case that there is a necessity that they be recounted, and that they have not been tampered with, the order to that effect will be made. But an inspection of the ballots alone, upon a recount, might furnish ample evi-

dence that they had been tampered with and changed since cast; and where one ballot is taken out, and another ballot, of the same general appearance, but for a different candidate or candidates, is put in its place, it can only be learned after an inspection of the ballots, upon a recount, by the voter declaring that it has been changed. Hence, after the recount, and consequent opportunity for inspection of ballots, it is competent for the incumbent to show that the ballots have been changed, if such is the fact, or that they are, in any respect, to be discredited for other cause.

*Third*—Appellee contends that appellant was improperly allowed to introduce evidence proving that certain persons who had voted for appellee, whose names are not given in his answer, were not legal voters.

In *City of Beardstown* v. *City of Virginia*, 81 Ill. 544, Eason and Mains had each voted ballots for removal, but the election judges refused to count them because they deemed them double ballots. On the trial, satisfactory evidence was introduced that they were in fact not liable to the objection, and the court then counted them for removal. It was objected, that there was no allegation in the answer under which this could be done; but we said: "The bill alleges that a majority of the legal votes cast at said election were not for removal, but against it. The answer denies the allegation. Under such allegation and denial, we regard the evidence as properly admitted."

Less particularity is required in the answer of the defendant than in the petition. 1 Daniell's Ch. Pr. (3d Am. ed.) 727. It is, among other things, alleged in the petition, that appellee was actually elected to the office of treasurer, and to sustain this allegation it was incumbent on him to prove that a majority of the legal votes cast at the election were cast for him. It is true, that the production of ballots cast for him raised the presumption, *prima facie*, that they were legal; but the burden of proof, nevertheless, was upon him, and it was therefore incumbent upon him to introduce evidence of the ballots in the

first instance. Appellant denied that allegation, and, under that denial, was entitled to rebut the presumptive case thus made by appellee, by disproving the *prima facie* case made by the ballots,—and this he did, by showing that they were not what they purported to be,—that they were not the ballots of legal voters. Aside from this, however, there is a general allegation in the answer, that over and above the illegal votes mentioned specifically in the answer, ten illegal votes were counted for appellee for the office of treasurer. Undoubtedly, this allegation is too indefinite, and if the answer had been excepted to, an exception to that allegation should have been sustained. But it was not excepted to, and therefore what has been said in respect to the too general allegations of the petition in respect of a number of the polls, is applicable here.

This brings us to specific rulings on the merits of the case.

*First*—Appellant, after appellee had concluded evidence on his behalf as to the condition and in explanation of ballots cast at the election, introduced Joseph W. Davis, who testified that he voted at the election in Clayton township, and appellant then proposed to prove that the witness voted ballot numbered 143, at that poll, and that when he voted it, it had the name of John B. Kreitz for county treasurer printed on the ticket, and that it did not then have a paster stuck on and placed over the name of John B. Kreitz, and that it was uncrossed, and was, plainly to be seen, a ticket for John B. Kreitz for county treasurer; that the ticket, when recounted, had a paster, on which was printed the name of C. F. A. Behrensmeyer, pasted over the printed name of John B. Kreitz, and that the name of Behrensmeyer was not on the ticket at the time witness voted. Counsel for appellee objected to the admission of this evidence, for the reason alleged, "that the evidence, if it ever could be admissible, presupposed fraud or improper conduct on the part of the election officers, and there is no charge of the kind in said Kreitz's answer, herein filed, as to the officers of the election of Clayton township; that hence the evidence

is not now admissible; that a ballot, after once in the box, can not be contradicted or changed by parol evidence,—at least, not without fraud charged, which is not done in the answer in this case; and because there is nothing in said Kreitz's said answer to found the evidence offered on, and because the identity of the ballots counted by the judges of election, with those counted on the recount of Clayton township, of which this ballot was one, was admitted by contestee before proceeding to such recount." The court sustained the objection, and refused to allow appellant to prove or to give evidence of the facts, or of any of them, and appellant excepted. It was at the same time proved that the witness was a legal voter at that poll. The witness was then asked for whom he voted for treasurer. This was objected to, for the reason that the ballot is the best evidence of that fact, and the court sustained the objection, and appellant excepted.

Following this objection in its order, it is manifestly not true that the evidence necessarily presupposes fraud in the election officers, for the paster may have been put on the ticket by a third party, when their attention was absorbed by their official duties in taking in or counting other ballots, or in preparing and signing their returns; or it may have been put on the ticket since the ballots left their hands, by stealth and artifice, and without the knowledge or gross neglect of any officer having custody of the ballots. But even if it be admitted that it does presuppose fraud in the election officers, it is to be kept in mind that the proper canvassing officers having found and declared Kreitz to be elected, the presumption is that he was elected, until the contrary is clearly established; that Behrensmeyer, in alleging that he was elected, and that Kreitz was not elected, by a majority of the legal votes cast at the election, assumes the affirmative, and, consequently, that the burden is upon him to clearly prove that a majority of the legal votes cast at the election were for him. It is immaterial that the production of a ballot received by the

judges of election is *prima facie* evidence that it is cast by a legal voter, for that affects only the order of giving evidence, and does not change the issue. As we have before indicated, appellant's denial of the allegation of the petition that Behrensmeyer was elected, and that Kreitz was not elected, by a majority of the legal votes cast at the election, simply closed the issue. It then devolved upon appellee to make out, by evidence, at least a *prima facie* case, and when he had done so, appellant was entitled to introduce evidence to show that the evidence thus introduced and relied upon by appellee was not what appellee claimed it to be, and, consequently, that what he introduced as legal ballots were not, in fact, legal ballots. Were appellant to raise a new issue,—one not presented by the petition,—the burden and order of introducing evidence would, of course, be directly the reverse; but that is irrelevant to the question before us.

It is undoubtedly true that a voter can not be allowed to say that he voted for one person, when he admits that he cast a ballot, which has not since been changed, showing that he voted for another person. But this is merely upon the principle that a writing can not be contradicted by parol. It is, however, always competent to show that even the most solemn writings are forgeries; and a ticket which has been changed, by a paster, to read as a vote for a man for a particular office different from the man for whom it read as a vote in the condition in which it was when cast, is a forgery. And the same is true where the ballot, after it is cast, is destroyed, and another and different ballot is put in its place. Quite clearly, therefore, this evidence would have proved that one ballot counted for appellee was not evidence of a lawful vote cast for him, but, on the contrary, that the vote should be counted as a vote given for appellant, and was, therefore, directly responsive to the allegation of the petition.

What is relied upon as an admission of the identity of the ballots cast and recounted, is thus recited in the record: "And

12—125 ILL.

the recount of the ballots returned to the clerk of the county court next hereinafter named, as cast at the said election for said office of county treasurer, at the" (here the poll is named,) "in said Adams county, being about to proceed, the said Behrensmeyer, the said contestant, stated to said Kreitz and his attorneys, that if any question as to the identity of the ballots cast at said" (naming the poll,) "with those about to be produced and counted by said Haselwood, were made, the said contestant wanted a judge or clerk of said last named district present, and would send for such judge or clerk, and have him present before proceeding to a recount of said last named ballots; and thereupon, the contestee making no question as to said identity, the recount of said last mentioned ballots proceeded without the presence of such judge or clerk." Very clearly, this can not be construed into an admission that the ballot was not changed after the recount of that poll was commenced and before that ballot was reached, which may have been the fact,—in other words, it is not an admission that no ballot of that poll would be thereafter changed before recounted. But it is also further quite evident that it could not have been intended an admission as to matters of which appellee could then know nothing. He, doubtless, then knew that the election officers supposed they had, and that they intended to count the ballots as they received them and placed them in the ballot-box, and that the same ballots were intended to be put up by them, and that they believed they were, and returned to the county clerk, as provided by statute. But the election officers could not know what was on the face of a ballot until they opened and read it; and since, in reading off the names on a ballot, and ascertaining the number of votes for the particular candidates for the respective offices, they are not required to take cognizance of the number which each ballot bears, but, on the contrary, they are by section 87, chapter 46, of the Revised Statutes of 1874, expressly forbidden, under severe penalties, from comparing the ballot with the poll-book, so as

to ascertain by whom the ballot was cast, it is impossible that they could know whether a ballot bearing a particular number,—as, for instance, that of this ballot,—had an erasure or paster on it; and all that they could know is, that the general appearance of the ballots, as a whole, is the same, or, by extreme possibility, that so many names for this office were erased and another name substituted, and so many pasters with one name upon it were pasted over another name; and waiving evidence simply waives that which is susceptible of evidence.

But aside from this, this admission was for the mere purpose of dispensing with preliminary proof. In order to recount the ballots, it was assumed, and properly so, a necessity should be shown, and the *prima facie* identity of the ballots to be recounted established. What the ballots might disclose when re-examined, no one could know in advance, and necessarily the proof to be thereafter offered could not be anticipated. When the recount was gone into, the purpose of the preliminary proof, and necessarily this admission, was accomplished; and it violates the fundamental rule of construction, that words are to be limited by their meaning, as applicable to the object in view when they are used, to hold that this admission goes beyond the right to recount the ballots. It is not contended, and it can not be, reasonably, that the mere fact that ballots are recounted, concludes all inquiry as to whether they are really the ballots cast, or that they have the same names upon them as when cast. The court therefore erred in excluding this evidence.

Appellant introduced Charles H. Matzenbacher, whose testimony proved that he was a lawful voter, and voted, at this election, in the ninth district of the city of Quincy, and appellant then offered to prove by him that he voted ballot numbered 330, at that poll, and that when he voted it the name of John B. Kreitz, for county treasurer, was upon it; that his name was not erased or scratched; that the name of Behrens-

meyer was not then interlined upon the ballot, under the name of John B. Kreitz, but the ballot was plainly a ballot for John B. Kreitz for county treasurer, and that the ballot was changed by erasing the name of Kreitz and interlining the name of Behrensmeyer, after he voted it. Appellee objected to the introduction of the evidence, and the court sustained the objection, to which appellant excepted. This objection, we must assume, as the record discloses no reason, is predicated upon the same reasoning as the objection to the testimony of Davis. What we have said in respect to that objection is equally pertinent here. The court erred in excluding the evidence.

Appellant also offered to prove by J. T. Seehorn, whom he showed to have been a legal voter, and to have voted, at this election, at the ninth election district in the city of Quincy, that he voted for John B. Kreitz for treasurer; that his ballot was numbered 28, and he offered to prove by other evidence, that there was, at the time of the recount, no such ballot among the ballots of that precinct. Appellee "objected generally, and because there is nothing in said Kreitz's answer herein, as to any abstracting of ballots in the said ninth precinct, or of any misconduct of election officers, of such kind, that there is nothing in said answer to file said proof on," and the court sustained the objection, and refused to allow the evidence to be given, and appellant excepted. We have already shown that evidence of this kind is competent, as rebutting the evidence given by appellee to make out his case in chief. Appellant could not have mentioned it in his answer, because he could not have known that the ballot was missing until the ballots were examined for recounting, which was long after the issues were made up. For aught that we can know, the ballot may have been inadvertently lost after the ballots were opened to be recounted, but before the recount of that poll was completed. Whether the ballot was lost by inadvertence or stolen by design, appellant was entitled to the benefit of it.

It was one of the lawful votes cast for him for treasurer. The court clearly erred in this ruling.

. Appellant also offered to prove by Charles Henry Matzenbacher that he was acquainted with twenty-five different persons, whose names were given; that each and all were voters, at this election, in the ninth precinct of the city of Quincy; that they all voted, at that election, in that precinct, for John B. Kreitz for county treasurer; that the names of each and all appear upon the poll-books of that precinct as having voted; that each name on the poll-books has a number opposite to it, and that no ballots were returned in the box corresponding to these numbers on the poll-books. Appellee objected to the introduction of the evidence, "on the ground that the evidence was incompetent, generally; that it related to ballots in a precinct where, at the time of the recount, the question of the identity of the ballots with those counted had been conceded; that in the order of trial, as marked out by the court, the evidence was not admissible at this time; that the evidence offered belonged to the case in chief; that the ballots and poll-books of the ninth precinct are the best evidence; that the evidence offered is secondary, and relates to ballots not declared ambiguous by the court, and because there is nothing in contestee's answer apprising contestant of any alleged change of ballots in this precinct, or any allegation therein on which to found the proof." The court sustained the objection and refused to allow the evidence to be given, and appellant excepted. The record does not disclose whether the court sustained the objection on all of these grounds, but it is to be inferred from the rulings upon the questions we have just been considering, that it was on the ground that the identity of the ballots had been conceded, and that the objection had not been specially raised in the answer. This objection, however, as the one last before considered, could not have been set up in the answer, for it could not have been known when the answer was filed. But the same reasoning is applicable here that was applicable

to the objection to the matters offered to be proved by Davis, except as to the suggestion that "in the order of trial marked out by the court, the evidence was not admissible at that time." But, unfortunately, under the ruling of the court it would have been admissible at no other time.

It appears from the abstract before us, that at the January term, 1887, of the court, the court fixed the 7th day of February, 1887, for the commencement of the hearing, and then "held and announced that offers of testimony as to other ballots not held by him patently ambiguous, might be made by the parties during the progress of the testimony, if they saw proper, but that he would not hear or admit any such testimony at any stage of the case." This was, at the time, excepted to by appellant. The time, then, when this evidence was offered, was unimportant, because it was thus ruled out at the opening of the trial. It was equivalent to saying: "It makes no difference when you offer it; I rule it out now." The counsel had a right to assume that the time of offering it was of no consequence,—that offering it was purely formal; and the court was notified, by the exception then taken, that appellant would stand upon his legal right to introduce such testimony. If the court ever changed this determination, the record fails to show it. If it was, in fact, changed, it was due to appellant's counsel to notify him of it in time to have procured and introduced his evidence. If it be true, as the offer supposes, and the objection, by implication, admits, that these parties voted, and numbers were placed opposite their names, but no corresponding ballots were in the box, the poll-books and ballot-box already before the court proved it, and appellant was entitled to have it considered on the hearing.

While we held in *Hodge, Jr.* v. *Linn,* 100 Ill. 402, that the failure to number any of the ballots cast at a particular poll was not sufficient reason for setting aside the return of that poll, it being proved that the omission was through a misapprehension of duty, and with no fraudulent intent, still the

statute requires the ballots to be numbered, and the presumption being that officers do their duty, it must be presumed, until the contrary is shown, that these ballots were numbered as they were cast, and that they have since been abstracted or lost from the ballot-box. It is provided by section 51, chapter 46, of the Revised Statutes of 1874, each clerk of the election shall keep a poll-list, which shall contain a column headed "number," and another headed "names of voters." The name of each elector voting shall be entered upon each of the poll-books by the clerks, in regular succession, under the proper headings. And it is provided by section 55 of the same act: "The ballot shall be folded by the voter, and delivered to one of the judges of election. * * * The clerks of the election shall enter the name of the voter, and his number, under the proper heading, in the poll-books, and the judges shall indorse on the back of the ticket offered, the number corresponding with the number of the voter on the books, and shall immediately put the ticket into the ballot-box." And this being done, the ballot must always bear the same number that is on the poll-books opposite the name of the voter.

It is undoubtedly susceptible of explanation that ballots are omitted to be numbered, or are inaccurately numbered through mistake; and so, here, had this evidence been admitted, as it should have been, the burden would then have been upon appellee to show, if such was the fact, that the ballots, as cast, were actually in the box, but by mistake either bearing no number or a different number than that opposite the name of the voter, and in the absence of such proof it would have been presumed that appellant was fraudulently denied, in the count, the benefit of that many votes. *Prima facie*, therefore, the effect of this offer is to prove that the number of votes indicated were cast for appellant, and not counted for him on the recount of this poll, in addition to the number that were then actually counted for him, and in that view the court clearly erred in excluding the evidence offered.

On the recount of the sixteenth precinct, the court found two unnumbered ballots, both for appellant, and by examining the poll-list returned with the ballot-box, it was determined that there was one more ballot than names on the poll-list. The court therefore destroyed one of these unnumbered ballots. The statute provides that each clerk of the election shall keep a poll-list, one of which is to be kept in the ballot-box, and the other returned to the county clerk. (Rev. Stat. 1874, chap. 46, secs. 51-62.) And section 57 of the same chapter requires that the judges, after the polls are closed, shall count the ballots, and that "they shall first count the whole number in the box. If the ballots shall be found to exceed the number of names entered on each of the poll-lists, they shall reject the ballots, if any be found upon which no number is marked." Now, this duty, it is to be presumed, was discharged by the judges of election, and assuming, as appellee does, that the ballots are the same, either the court made a mistake in counting, or the poll-lists did not agree. It is, however, quite as reasonable to assume that the poll-lists did not agree, as that there was a mistake in any other respect, and it admits of no controversy that there was a mistake in omitting to number at least one of the ballots. The statute requires, it will be noted, before the ballot shall be destroyed, that it shall be ascertained that the number of the ballots in the box "exceeds the number of names entered *on each of the poll-lists*," and that was not here done, and the action of the court was therefore erroneous.

It is contended by appellant, that in no event was the court authorized to destroy the ballot, because, it is said, it was no fault of the voter that it was not numbered. If it be conceded that the numbered ballot was actually cast by a legal voter, this position will be true. But the statute contemplates that the ballots shall be correctly numbered, and hence that every ballot, as cast, will have the number of the voter indorsed upon it, and this being done, it must follow that the unnumbered

ballot is improperly in the box, and it should therefore be destroyed.

Frederick C. Inman voted for appellant in the third precinct of Quincy. The court held him to be an illegal voter, and rejected his vote, upon his own testimony. He testified: "I thought I was twenty-one years old when I voted, but I find that I was twenty-one the sixth of last February." Being asked, "This month?" he answered, "Yes." On cross-examination, question and answer proceeded thus: "How did you come to believe that you were twenty-one? My father had told me I was twenty-one. Is your father living here? No, sir; he lives in Crown Point, Indiana. Did he ever live here? Yes. Up to what time? 'The 8th of March last. And how long have you been informed by him that you were twenty-one years old? Since the primary election." He was afterwards asked: "What was your reputed birthday in the family?" and he answered, "1865,—February 6." He further said that he had never known to the contrary until after the last election; that from the time he could remember he always counted his birthday from that date; that he celebrated his sixteenth birthday sixteen years after February 6, 1865. On re-direct examination he was asked, "Well, what does your family record say?" That was objected to, but the court overruled the objection, and permitted the witness to answer; and he said, "The family record says I was born February 6, 1866." This was clearly error. This family record, which he never heard of until since the election, speaking directly contrary to his father's statements prior to the election, and to the reputation in the family before that time, should have been produced, or if that was impossible, a proved copy should have been produced. It should have been shown when and by whom the record was made. It can not be said this witness has any knowledge of his own, confirmatory of the record, and his whole story looks extremely suspicious. For aught that appears, the record may have been made for the case. At all events, he may have misunderstood

its language, and parol evidence of his conclusion of what it proves ought not to have been received.

Ballots,—some claimed for one party and some claimed for the other,—were rejected by the court in a number of instances, because there were the names of both appellee and appellant,— the one written, and the other printed,—on the same ballot for treasurer. Appellee contends, on the authority of *The People* v. *Saxton,* 22 N. Y. 309, that such ballots should have been counted as for the person whose name was written,—that writing the one name was in effect cancelling the other name printed. The reasoning of *The People* v. *Saxton* only applies to cases where it is shown that the voter, with his own hand, writes the name of the candidate. Where a ballot is furnished a voter by another party, already having upon it a printed and a written name, as may quite often be the case, there can be no reason for saying that the ballot, as to him, is anywise different from one having both names written or both names printed upon it, for no act of his has caused it to be as it is. But our statute seems to us imperative. It says: "If more persons are designated for any office than there are candidates to be elected,  *  *  *  such part of the ticket shall not be counted for either of the candidates." And this was held obligatory as to this class of tickets, in *Clark* v. *Robinson,* 88 Ill. 500.

In several instances, two ballots were folded together,—the one within the other,—and the outside one alone numbered. The judges of the election omitted to count them, but fastened them together marked "double ballots," and they were returned to the county clerk with the other ballots. The court refused to count either of such ballots, and this we think was right. The statute requires the names of the candidates voted for, all to be written or printed on the same piece of paper. (Rev. Stat. 1874, chap. 46, sec. 54.) Enclosing one ballot within the other, with the names of the candidates upon each, was plainly an attempt to vote twice, and therefore such a fraud

upon the rights of other electors as required that his ballot should not be counted. *Webster* v. *Gilmore*, 91 Ill. 324.

August Sieckman proved, by his own testimony, that he was a legal voter in the 11th precinct of the city of Quincy; that he then, and for many years past, had resided in that precinct, in the house which had belonged to his mother, but which, she dying, he and his sister had jointly inherited; that he took his meals in the ninth precinct, but his home was and had been in this house in the eleventh precinct; that he gave his ballot to one of the judges, who took it, and said "that he would see about it," but he subsequently refused to deposit it in the ballot-box. Appellant insists that this ballot ought to have been counted for him. We think the court below properly refused to count it. The voter knew that the ballot was not accepted as a vote. He knew it was not deposited in the ballot-box, and he should have furnished the evidence required by the statute, to entitle his vote to be received, and have insisted upon his rights. Whether the judges were culpable in not receiving his ballot, is not pertinent here. It is sufficient that they did not receive it.

The question is presented by rulings on ballots, some of which are counted for one party and some of which are counted for the other party, to what extent is evidence admissible to explain a ballot, or show the intention of the voter in casting it.

In *The People ex rel.* v. *Matteson*, 17 Ill. 167, it was held that votes designating the office voted for as "police justices," should be counted as votes for "police magistrates," there being but one office coming within the reasonable contemplation of the words "police justice," and that designated by the statute "police magistrate." The court said: "In election contests, as in other cases, the question to be determined depends upon facts to be ascertained, and here we are simply called upon to determine, from the evidence before us, the simple fact of the intention of the voters who cast their votes. Did they intend

to vote for the relators to fill the offices for which this election was ordered?"

In *Clark* v. *Robinson*, 88 Ill. 508, it was said: "Three votes cast, respectively, for W. E. Robso, Robertson, and W. E. Robers, were counted for appellee, to which objection is made. These votes were cast for circuit clerk. The evidence shows that there were no candidates for circuit clerk at the election, except appellant and appellee. We can have no doubt, from the evidence, that these three votes were intended for the appellee. 'Robso' and 'Robers,' no doubt, were abbreviations for the name of appellee, and the cause of the abbreviation is apparent from the ballots alone." Another ballot, containing the name of "Robin⁓," written on the margin to the left of "for circuit clerk," and with a continuation at the end, with a light mark, having the name of Clark erased, it was held should be counted for Robinson. It may not be improper to observe with reference to the ticket for Robertson, as to which nothing was said, that the court felt bound to take judicial cognizance that "Robinson" and "Robertson," as ordinarily pronounced, especially by unlettered and careless talkers, were *idem sonans,* being in accordance with the literal spelling of neither, — "Robison."

In *McKinnon* v. *The People*, 110 Ill. 305, ballots were cast for Henry Malzacher and for Joseph Malzacher, for the office of town clerk. It was held competent to prove that Henry Malzacher was the democratic candidate for that office, and Donald McKinnon the republican candidate, and that there were no other candidates for the office; that no person resided within the town, of the name of Joseph Malzacher, and that the name Joseph Malzacher was printed on a number of democratic tickets by mistake, supposing that Henry was named Joseph, and that such tickets got circulated to some extent, and voted, by mistake, supposing that Joseph, and not Henry, was the democratic nominee for the office. And we held the votes thus cast for *Joseph* should be counted for *Henry.*

An analogous case is *Carpenter* v. *Ely,* 4 Wis. 420, referred to and quoted from in that case.    In laying down the rule in *McKinnon* v. *The People,* we quoted, with approval, from Cooley on Constitutional Limitations, (1st ed.) section 611, that "evidence of such facts as may be called the circumstances surrounding the election, such as who were the candidates brought forward by the nominating conventions; whether other persons of the same name resided in the district from which the officer was to be chosen, and if so, whether they were eligible, or had been named for the office; if a ballot was printed imperfectly, how it came to be so printed, and the like, is admissible for the purpose of showing that an imperfect ballot was meant for a particular candidate, unless the name is so different that to thus apply it would be to contradict the ballot itself, or unless the ballot is so defective that it fails to show any intention whatever."

There is less difficulty in stating the rule in general terms than in applying it to particular cases.    Manifestly, it would not be competent to hear the voter say that he intended a ballot plainly for a particular name, for one having no such similarity of sound as that one might reasonably be intended for the other; and it is quite as obvious that it is competent to prove, by the elector, what he understood the names of the candidates to be, and how he reads his ballot.    If he has used the letters of a foreign language to express the name, it is competent to prove, by the voter, or by some one else versed in that language, what word or words they make.    If the characters are so complex in their formation, or so imperfectly formed, or so obscurely impressed, as to make it difficult to read them, it is competent to prove, by any one understanding them, what they are.    What is not admissible, is to show that something was intended which is plainly contradictory of what was done,—as, for instance, that a ballot cast with the name of Jones for a particular office upon it, was intended to be a vote for Smith for the same office.    And so, upon like princi-

ple, where it is shown that there has been what appears to be an erasure of a name, it may be shown that it was not done by the voter, or that it was the result of an accident, and not of intention; but the fact of erasure being conceded to have been the deliberate act of the voter, it can not be explained that by it he intended a different result than that which the law implies from it.

It was in proof that John B. Kreitz was the democratic nominee, Charles F. A. Behrensmeyer the republican nominee, and B. L. Dickerman the prohibition nominee, for the office of treasurer of Adams county, and that there were no other candidates for that office at the election in November, 1886. It was also in proof, that some tickets bore the name of John M. Kreitz for the office of county treasurer, and that John B. Kreitz had a brother of that name, who had, at a former time, held the office of sheriff of said county, and perhaps also some minor office at a still prior time. But it was, on the other hand, proved that John B. Kreitz was ordinarily known and called John Kreitz, and that John M. Kreitz was ordinarily known and called Matt Kreitz, and that John M. Kreitz was not a candidate for any office at that election. Ordinarily, the middle letter is no part of the name, and, under the circumstances mentioned, the trial court properly attached no significance to it. The vote was evidently intended, as it was counted, for John B. Kreitz. It was likewise in proof that there were other persons than appellee in Adams county of the name of Behrensmeyer, and appellant objected to many ballots counted for appellee which had merely Behrensmeyer upon them, for treasurer, without any designation of the christian name. It was shown that no other Behrensmeyer was a candidate, at that election, for the office of treasurer, or any other office, and we think, therefore, the court properly counted the ballots as cast for appellee.

Appellant also objects that parol evidence was admitted to explain what name was intended by certain obscurely and im-

perfectly written ballots which were counted for appellee. So far as those ballots could, by one able to read them, be given a sound which might be understood to be intended to express the name Behrensmeyer, or that name as it was pronounced by any number of people, we think the evidence was properly admitted. There was evidence that some persons pronounced the name as Benmire, and perhaps that others pronounced it by a still shorter name. Any evidence, therefore, proving that the voter had intended and attempted to express appellee's name as he understood it, was properly admissible. Objections of a like character were made to tickets counted for appellee, and, of course, the same rule was properly applied there. It is evident that imperfect spellers might spell Kreitz, "Krietz," "Kritz," "Critz," or even omitting the "z."

We recall only two instances in which we think the rule in this respect was misapplied. In certain ballots it was claimed the name written for treasurer was "John B. Knirs," and in certain other ballots it was claimed the name written for treasurer was "Dehbsumeyer." If these letters were really employed, we think the ballots could not be aided by extraneous proof, since we discover no such similarity in sound between these names and the names of the candidates as might induce the one to be mistaken·for the other, and, plainly, neither can be intended as a contraction of the name of the candidate. It is not improbable, however, that this results from a misapprehension of the characters employed.

In many tickets the name of the candidate for treasurer, as printed, is erased, and the name of the other candidate is written over the name of the office, as thus:

(Written)— CHARLES F. A. BEHRENSMEYER.

*For County Treasurer:*

(Printed)— ~~John B. Kreitz.~~ (Erased in pencil.)

The same thing also frequently occurs with reference to the office next below, which is·that of county superintendent of

schools, for which John Jimison was the democratic candidate, and Newton J. Hinton the republican candidate, and that causes what, at first blush, seems to be, and appellant claims is, a ballot with two votes for county treasurer, as thus:

*For County Treasurer:*
(Printed)—       CHARLES F. A. BEHRENSMEYER.
(Written)—         JOHN JIMISON.

*For County Superintendent of Schools:*
(Printed)—       ~~NEWTON J. HINTON.~~    (Erased in pencil.)

We think, in the first named instance, it may fairly be construed as a vote for county treasurer, as thus, "Charles F. A. Behrensmeyer, for county treasurer." McCrary on Elections, (2d ed.) sec. 397. And in that view, in the last instance the vote is "for John Jimison for county superintendent of schools," and not two votes for treasurer.

A different case, however, is presented in a few other ballots, where the printed name is stricken out of the ballot, and no name is written immediately above or immediately below the designation, "For County Treasurer," but the name of one of the candidates for county treasurer is written below the designation, "For County Superintendent of Schools," and below the name of a candidate for that office. Here is, palpably, upon the face of the ballot, no vote for county treasurer and two votes for county superintendent of schools. The rule seems to admit of no evidence of what was the intention, under these circumstances. There is no ambiguity. The facts present simply the question, may the voter do one thing, and say that he meant something entirely different? The court properly held that he could not.

Two ballots were found in the box of one of the polls, each torn from top to bottom, across all the names, into two distinct fragments, with ballot numbers on one of the fragments of each ballot. The question is, should that have been treated as a cancellation, or should they have been counted? Since

voting a cancelled ballot is a useless and senseless act, we think cancellation should not be presumed from the mere fact that a torn ballot is found in the box, but that, on the contrary, it should be presumed that the tearing was accidental. It may, however, be proved that the tearing was by the voter, and intentional, and upon such proof being made the ballot will be held to be cancelled. There was no such proof here, and the ballots were therefore properly counted.

In one or more instances the name of the office was completely cancelled, but the name of one of the candidates was written beneath the cancelled name of office. On the authority of *Clark* v. *Robinson, supra,* such ballots were properly not counted.

In some ballots the name of the candidate was written into the title of the office, obscuring and partially obliterating the letters designating the name of the office. We think it was at least susceptible of explanation that this was accidental and unintentional, and hence no cancellation.

The question arises on a number of ballots,—on some counted for each party,—what constitutes the "permanent abode" of the elector, prescribed by the statute as an indispensable requisite to the right to vote? We held in *Dale* v. *Irwin,* 78 Ill. 170, that it "means nothing more than a domicile,—a home,— which the party is at liberty to leave as interest or whim may dictate, but without any present intention to change it,"—and that ruling has been adhered to in other cases. This was sufficiently accurate as applied to the facts in those cases, but there is an obvious inaccuracy in the latter part of the quotation when considered with reference to some of the facts in the present record, and we can not better state it and our views thereon than by quoting from the report made in the case of *Cessna* v. *Meyers,* appendix to 2d ed. of McCrary on Elections, bottom of p. 489, and top of p. 498. It is there said: "A man may acquire a domicile if he be personally present in a place and elect that as his home, even if he never design to

13—125 ILL.

remain there always, but design at the end of some short time
to remove and acquire another. A clergyman of the Methodist
church, who is settled for two years, may surely make his home
for two years with his flock, although he means at the end of
that period to remove and gain another." And again: "Sup-
pose a man, single, with no property, to come from Ireland,
and be employed all his life on railroads, or other like works,
at different places in succession. If he does not acquire a
residence he can never become a citizen, because he never
would reside in this country at all. It seems to us that to such
persons the general rule above stated," (*i. e.*, in substance, the
rule as quoted from *Dale* v. *Irwin, supra,*) "does not apply.
Where a man who has no interests or relations in life which
afford a presumption that his home is elsewhere, comes into
an election district for the purpose of working on a railroad
for a definite or an indefinite time, being without a family, or
having his family with him, expecting that the question whether
he shall remain or go elsewhere is to depend upon the chances
of his obtaining work, having abandoned, both in fact and in-
tention, all former residences, and intends to make that his
home while his work lasts, that will constitute his residence,
both for the purpose of such jurisdiction over him as residence
confers, and for the purpose of exercising his privileges as a
citizen. Of course the intent above supposed must be in good
faith, and an intent to make such district the home for all
purposes. The party's intent to vote in the district where he
is, he knowing all the time that his home is elsewhere, will not
answer the law."

It can, under our system, need no elucidation, that a man
can not be entitled to vote, at any one time, in either of two
places, as he shall elect; and it is, in one or more instances
in this record, pertinent to keep in mind that it does not fol-
low because a man must have a domicile somewhere, and that
a domicile once gained remains until a new one is acquired,
that a man must be entitled to vote somewhere, or that the

right to vote at a particular poll, being once established, is presumed to continue until the right to vote elsewhere is shown. Permanent residence is but one of the requisites of the right to vote, and it must, in this State, always precede the election by an extended space of time,—in one respect, for a year, in others, for ninety and thirty days, respectively. (Const. art. 7, sec. 1.) But abandonment of a residence is instantaneous, and if it be, by a voter, of a residence in one voting district, at a date too near the election for the requisite intervening time of residence to be a voter in another voting district to which he has removed, the voter will be entitled to vote in neither voting district.

We have frequently held, that when a party leaves his residence, or acquires a new one, it is the intention with which he does so that is to control. Hence the shortest absence, if at the time intended as a permanent abandonment, is sufficient, although the party may soon afterwards change his intention; while, on the other hand, an absence for months, or even years, if all the while intended as a mere temporary absence for some temporary purpose, to be followed by a resumption of the former residence, will not be an abandonment. On the question of intention, the declaration of the party, though admissible, is not necessarily conclusive, because it may be disproved by his acts,—as thus: If a party were to remove his family to a particular district, there build and furnish them a home, keep his property there, return there constantly, as leisure allowed, and remain there with his family during sickness and unemployed time, this would constitute his residence, notwithstanding he might be employed in labor in another district, and claim that to be his residence, (*The People* v. *Holden*, 28 Cal. 124,) for, on questions of domicile, less weight is given to the party's declarations than to his acts. 3 Jacob's Fisher's Digest, title "Domicile," p. 4225; *Lessee of Butler* v. *Farnsworth*, 4 Wash. C. C. 103.

The controlling inquiry would seem to be, where, if at all, does the party actually make his home, and claim, for the time, to exercise rights of property or of citizenship incident to or resulting from permanent residence. And therefore, if a party having no family, leave, or having a family, take it with him and leave this State and go to another State and there make a home, and seek to acquire rights by virtue of its being a permanent residence, such as acquiring a homestead under the acts of Congress, or exercising the rights of an elector, to which permanent residence is a requisite, his subsequently testifying that he had never intended to permanently abandon his residence here, but had all the time intended at some future day to return, could not control. There must be a present continuous citizenship, with its attendant incidents and rights, subject, of course, to certain necessary guards against fraud, somewhere, and if it be here it can not be abroad; and if it be claimed and exercised abroad, that is conclusive that it had at that time ceased to be claimed here.

The question is made material, by objections raised upon the trial, to what extent is evidence of the declarations of the voter competent to prove that he was disqualified to vote. In *City of Beardstown* v. *City of Virginia,* 81 Ill. 542, we refused to follow the English rule, which permits any declarations of a voter tending to prove that he was not qualified to vote, to be given in evidence in a contest where his right to vote is drawn in question, and held that declarations of a voter subsequent to the election were incompetent, and we have no inclination to now depart from that ruling. Since the question of the intention, as well as of the act of the party in leaving a particular abode and adopting and retaining another, is the subject of proof, it must follow that evidence applicable to either is admissible, and that although less weight is given to the party's declarations than to his acts, still his declarations of his mental state, so long as that shall be the subject of inquiry, must be admissible; and so it is held that conversations and decla-

rations in regard to present or future domicile, although not accompanying acts, are admissible in evidence, and must be weighed with the other evidence. Although the lowest species of evidence, they are competent. (3 Jacob's Law Dic. title "Domicile," 1, p. 4225.) Upon this principle, in *Thorndike* v. *Boston*, 1 Metc. 242, it was held that a letter written from the plaintiff to his agent in Boston, before the controversy in litigation arose, in which he expressed his intention not to return to Boston, was admissible in evidence. And again, in *Killburn* v. *Bennett*, 5 Metc. 199, declarations of a party's future intention to change his domicile were held admissible. It is obvious that a declaration that a party, at a particular time, was residing in one place, would be negative evidence that he was not, at that time, residing in another; or a declaration that he was intending to change his residence would negative the idea that he was intending to remain; and so, also, the reverse.

Question was raised as to whether certain persons were citizens,—having been alien born,—and also as to sufficiency of proof of naturalization. It was held in *Kelly* v. *Owen*, 7 Wall. 496, that the act of the 10th of February, 1855, which declares that "any woman who might lawfully be naturalized under the existing laws, married, or who shall be married to, a citizen of the United States, shall be deemed and taken to be a citizen," confers the privileges of citizenship upon women married to citizens of the United States, if they are of the class of persons for whose naturalization the previous acts of Congress provide, —*i. e.*, free white persons; that the terms "married," or "who shall be married," do not refer to the time when the ceremony of marriage is celebrated, but to a state of marriage; that "they mean that whenever a woman who, under previous acts, might be naturalized, is in a state of marriage to a citizen, whether his citizenship existed at the passage of the act, or subsequently, or before or after the marriage, she becomes, by that fact, a citizen also." The citizenship of a woman thus

acquired is not lost by the subsequent death of her husband, and her afterwards intermarrying with an alien. (See opinions of Attorney General, vol. 15, p. 559.) And the children of such a woman, under the age of twenty-one years, become citizens by virtue of her citizenship. *Dale* v. *Irwin,* 78 Ill. 186; *City of Beardstown* v. *City of Virginia,* 81 id. 541; *United States* v. *Kellar,* 11 Biss. 314; 13 Fed. Rep. 84; *Leonard* v. *Grant,* 6 Sawyer's C. C. 603; *People* v. *Newell,* 38 Hun, 78. We are, however, aware of no authority holding that the effect of this naturalization will extend to members of the family who are not children. Records of naturalization are nowise different from other records. When destroyed, secondary evidence of their contents may be given, just as may secondary evidence of the contents of any other record be given.

The views expressed necessarily lead to a reversal of the judgment below, and upon another trial the rules herein stated will, we apprehend, enable the trial court to dispose of all the material controverted questions.

The judgment is reversed, and the cause remanded for further proceedings consistent with this opinion.

*Judgment reversed.*