(No. 26444.—

H. A. MESSMAN *et al.* Appellants, *vs.* NEWMAN TOWNSHIP HIGH SCHOOL DISTRICT No. 150, Appellee.

*Opinion filed January 20, 1942.*

Harry L. Pate, for appellants.

Nichols & Jones, for appellee.

Mr. Chief Justice Murphy delivered the opinion of the court:

This is a direct appeal from a judgment of the circuit court of Douglas county entered in a *quo warranto* action brought in the name of the People by the plaintiffs on their own relation against the defendant, Newman Town-

ship High School District No. 150. The purpose of the suit was to question the right of the defendant to exercise its franchise and corporate authority over 42½ sections of land located in Douglas county and which had, prior to December 15, 1937, been within a non-high school district and was on or about that date detached from the non-high school district and annexed to the defendant district. After the court overruled defendant's motion to dismiss the complaint, or in the alternative to strike parts thereof, it filed an answer of justification in which it set forth the proceedings by which the territory involved was detached from one district and added to the other. Questions of fact were presented and after a hearing on the same, plaintiffs' complaint was dismissed. Defendant has filed cross-errors in which it urges several objections, one of which is that section 2 of the Quo Warranto act (Ill. Rev. Stat. 1941, chap. 112, par. 10) is unconstitutional insofar as it undertakes to confer the right upon individuals to obtain leave of court and file a *quo warranto* action in the name of the People on their own relation. The trial court found for the defendant on the issues of fact and on those questions the judgment must be affirmed. Therefore, it will not be necessary to consider the constitutional question or any matters raised on the cross-errors.

The proceeding for the detachment of territory from a non-high school district, and the annexation of it to a high school district is provided for by section 96a of the School law. (Ill. Rev. Stat. 1941, chap. 122, par. 104a.) The proceeding is initiated by petition being filed with the proper county superintendent of schools containing a description of the land involved, the necessary prayer for detachment and annexation and signed "by a majority of the legal voters residing in any territory within such non-high school district, which territory shall be compact and contiguous and adjacent to any community or township

high school district, and also signed by a majority of the legal voters residing in such community or township high school district." The form of petition and the affidavits to be attached to it are set forth in the law. The county superintendent of schools with whom the same is filed, is required to file a map with the county clerk showing the new and added boundaries of the high school district and whenever said map is filed with the county clerk, the territory is thereby detached from the non-high school district and ceases to be a part thereof and becomes a part of the high school district to which it has been annexed. Provision is made for the filing of extra petitions and maps where the land involved is located in one or more counties.

Plaintiffs contend the petitions filed were void and did not confer jurisdiction on the county superintendent of schools to act for the reason they were not signed by a majority of the legal voters residing in the territory to be detached from one district and added to the other. No other attack is made against the proceeding.

The petition was filed with the county superintendent of schools of Douglas county, December 15, 1937. The exact date the various persons attached their signatures to the petition is not shown but it was between the dates of December 1 and 15. In fixing a time for computing a period of residence, the trial court adopted the date of December 15, 1937, and no error is assigned in that regard. It was stipulated that 475 persons possessed the necessary qualifications of legal voters of the territory but there were others which the stipulation did not cover. Evidence was introduced as to their qualifications and from such list the trial court found 21 of them were qualified to be counted as legal voters of the disputed territory, thus making a total of 496. Five of these, namely: Orin Chism, Julia Chism, Charles Porter, Mrs. Charles Porter and Verla Porter, signed the petition and although it added to the

grand total of legal voters of the territory, plaintiffs objected to their qualifications as signers of the petition. Plaintiffs also contended that Cliff Reed, Mrs. Nova Harshbarger and G. E. Miller, none of whom had signed the petition, should be counted as legal voters.

Cliff Reed resided in the territory but the court found that he was not a legal voter. Reed did not testify. It was stipulated that in 1933 he pleaded guilty to grand larceny and was committed to the Illinois State Reformatry from one to ten years. The evidence does not show when he was released from that institution or that he has ever been restored to his rights as a citizen. One who had held the office of township supervisor testified that Reed had voted in the district subsequent to his conviction in 1933. Section 7 of division 2 of the Criminal Code, (Ill. Rev. Stat. 1941, chap. 38, par. 587,) declares what shall be deemed to be infamous crimes and includes larceny if the punishment is by imprisonment in the penitentiary. It further provides that anyone convicted of an infamous crime shall be rendered incapable of voting in any election unless he is restored to such rights by pardon or according to law. The stipulation established the fact that Reed had been convicted of an infamous crime and there is no evidence to show that his disqualifications arising from such conviction were ever removed. The evidence of the supervisor, that Reed voted subsequent to his conviction, is not sufficient. Plaintiffs having offered evidence to establish Reed's qualifications as a voter and then later entering into the stipulation showing that he was disqualified, the burden was upon them to show that the disqualification had been removed.

It is conceded that Mrs. Nova Harshbarger resided in the territory on December 15, 1937, but the defendant says that she had not been a resident in the territory for thirty days prior thereto. In August, 1936, she was engaged in nursing and went to the home of her present husband, Clyde Harshbarger, to care for a sick person. She was

employed in that capacity until November 2, 1936. During that period of time she considered her home to be with her son, who lived outside this territory. After completing the nursing service in the Harshbarger home, she was employed by others who lived outside the territory. This continued until April, 1937. The evidence is not clear as to what her employment was from April to November 17, 1937. About October 1, 1937, she and Mr. Harshbarger purchased some furniture which they expected to use in their home after their marriage November 17, but it does not appear that anything more was done with it than to place it in storage in the disputed territory. She never returned to the territory as a nurse after leaving the Harshbarger home November, 1936. On her marriage November 17, she and her husband established their home where he had been living. This was the first time she was a resident in the territory and it being less than thirty days prior to December 15, she was not a qualified voter on the latter date.

G. E. Miller, a witness called on behalf of plaintiff, testified to the various places he resided up to and including July, 1937. They were all outside the disputed territory. At that time he was employed as a farm hand to work for Logan Smith and in July moved to the Logan Smith farm. Plaintiffs asked him the location of that farm and he testified it was a mile east and three south of Newman, which according to the maps in the record would be outside the disputed territory and in the adjoining county. Plaintiffs called him for the purpose of showing he was a legal voter of the territory but his evidence does not establish such fact.

Plaintiffs claim O. Chism and Julia Chism, husband and wife, who signed the petition, were not residents of Illinois one year prior to December 15, 1937. Several years prior to 1936 they resided in Newman, Douglas county, and moved to Iowa, where they established their residence. In 1935 or 1936, they acquired land in the disputed territory

and in the fall of 1936 rented a house in Newman for residence purposes. On December 15, 1936, they moved their household effects from Iowa to Illinois, arriving at Newman about 4 o'clock P. M. on that date. The truck containing the property was not unloaded until the following day and the night of December 15 they stayed with friends in Newman. When they left Iowa on December 15, 1936, it was with the intention of abandoning their residence in that State and establishing one in Illinois. On that date they had a home which they expected to occupy in Newman and the fact that they did not unload the truck or move into the home until the 16th is of no consequence. Their new residence was acquired on December 15, 1936, and they were legal voters of the disputed territory on the date in question.

The qualifications of Charles Porter, Laura Porter, his wife, and Verla Porter, their daughter, may be considered together. They signed the petition. Porter was a tenant-farmer residing with his family in the disputed territory. In the fall of 1937, he became ill and he and his family left the farm home and went to live with a married daughter in Newman, which was outside the territory. They took with them a piano belonging to Verla and some other items of household effects. The remainder of their household belongings were stored in a room in the residence on the farm. After leaving the farm he engaged a laborer to harvest his corn, and as a part of the contract of employment permitted him to occupy all of the house except the room where Porter's furniture was stored. The laborer vacated the property December 26, 1937, after the corn was gathered. The evidence is that Porter had moved to Newman on account of his health. It appears that he was not able to engage in hard labor, but that he returned to the farm almost every day and cared for the property he left there which included poultry and livestock. The Por-

ters all testified that they moved to Newman on account of his health and expected to return to the farm in the spring of 1938 but by reason of his continued illness and the necessity of an operation, they were not able to move back to the farm until the fall of that year.

Plaintiffs rely upon *Pope* v. *Board of Election Comrs.* 370 Ill. 196; *Park* v. *Hood,* 374 id. 36, and *Coffey* v. *Board of Election Comrs.* 375 id. 385, in support of their contention that the Porters abandoned their residence in the disputed territory when they moved into their daughter's home in the city of Newman. The facts as to residence of some of the voters discussed in the *Park case* are somewhat similar to those in this case, but we believe the difference makes a just ground for distinguishing the two cases. Here the farm home of the Porters was occupied for a limited time for the temporary purpose of having a man on the farm to shuck the corn. A part of the house was retained for their own use and although they did not stay there at nights such action is strong corroboration of their expressed intention that their absence from the residence was temporary and that they expected to return as soon as Porter's health improved. In the *Coffey case* it was said: "A residence for voting purposes is not lost by temporary removal with the intention to return," and the facts in this case fall within that statement. It is said in the *Coffey case* that Coffey's testimony concerning his intention to return to his house in East St. Louis after his younger children had been educated "did not square with his acts." In this case every act of the Porters "squares" with their expressed intention. The Porters were residents of the disputed territory and the court did not err in so holding. *Kreitz* v. *Behrensmeyer,* 125 Ill. 141, *Welsh* v. *Shumway,* 232 id. 54.

The 475 signatures covered by the stipulation, plus the 16 added by the court's ruling, plus the two Chisms and

the three Porters, makes a total of 496 legal voters residing in the disputed territory. A majority of these would be 249.

The remaining contentions of plaintiffs refer to the court's ruling in counting the names of certain persons on the petition as having been properly attached. For purposes of discussion these may be grouped according to principles involved. Marion Wilkerson, an aged man, unable to read or write, signed the petition by mark. On direct examination, he testified he did not know its contents but on cross-examination he stated that the petition was read aloud in his presence before he signed it. Pearl Davis testified that she signed the petition, but said she did not take time from her work to read it. The genuineness of Wilkerson's mark and Pearl Davis' signature was thereby fully established. Wilkerson's admission on cross-examination that he heard the petition read, forbids any implication that this ignorant old man was led to attach his signature without knowledge of its contents. Mrs. Davis' failure to know its contents arises from her unwillingness to take time to read it. Their names were properly counted.

Objection is made by plaintiffs to the names of Ersel Sutton, Nellie F. Nidifer, John E. Nidifer, Charles Nidifer and Russell A. Nidifer. The evidence is that Ersel Sutton's husband signed her name to the petition out of her presence. In a few days thereafter the petition was presented to her and she wrote her name by tracing the name previously written by her husband. The names of the four Nidifers were written on the petition by Frank Nidifer, a member of their family. The following morning, the petition was presented to the four and each of them wrote their names by tracing the name previously written by Frank. Plaintiff contends that the statutory requirement that the petition shall be signed by the voter is not complied with by the tracing of signatures. It is evident that

Mrs. Sutton and the four Nidifers wished to sign the petition and were willing to adopt this method of having their names attached to the petition. It was done by them with the intent that it should be considered as an actual signing.

It was stipulated that 240 persons had signed the petition whose signatures were not questioned. To this may be added the two Chisms and the three Porters whose residence qualifications were discussed under the first branch of this case, making a total of 245 signers. Under the views expressed there may be added to this total, Marion Wilkerson, Pearl Davis, Ersel Sutton and the four Nidifers, making a total of 252, which is more than a majority of the total voters of the disputed territory which we have found to be 496.

Errors and cross-errors are assigned as to the qualifications of other persons, but inasmuch as a ruling on those could not change the results above determined, they will not be given consideration.

The judgment of the circuit court was correct and is affirmed.

*Judgment affirmed.*